**In re AUTO SPECIALTIES MANUFACTURING COMPANY, Debtor.**

**James W. BOYD, Trustee, Plaintiff,**

**v.**

**Benjamin G. SACHS and Manufacturers National Bank of Detroit, Defendants.**

**Bankruptcy No. SK 88–03095. Adv. P. No. 88–0527.**

United States Bankruptcy Court, W.D. Michigan, S.D.

Jan. 28, 1993.

See also 134 B.R. 227.

**460**

Drew, Cooper & Anding (John E. Anding and Christopher G. Hastings, briefed) Grand Rapids, MI, for plaintiff trustee.

Varnum, Riddering, Schmidt & Howlett (Jeffrey R. Hughes, briefed) Grand Rapids, MI, for defendant Manufacturers Nat. Bank of Detroit.

Garratt & Evans, P.C. (Mark D. Evans, briefed) Bloomfield Hills, MI, for defendant Benjamin G. Sachs.

James Boyd, trustee.

## TABLE OF CONTENTS

I. Opinion and Order Granting Manufacturers National Bank of Detroit's Motion for Partial Summary Judgment..........................460
 A. Introduction ..............................................460
 B. Jurisdiction ..............................................461
 C. Summary judgment ....................................461
 D. Statement of facts.....................................463
 E. Equitable subordination generally ...................477
 1. The fiduciary standard ........................478
 2. The non-fiduciary standard ....................488
 F. Conclusion ..............................................494
II. Combined Report and Recommendation and Opinion and Order Denying in Part and Granting in Part Benjamin G. Sachs' Motion for Partial Summary Judgment .......................................495
 A. Introduction ..............................................495
 B. Jurisdiction ..............................................495
 C. Breach of contract and breach of fiduciary duty (non-core) ..............496
 D. Fraudulent transfer and fraudulent conveyance (core) ..................497
 1. Constructive Fraud ............................497
 2. Actual Fraud ..................................500
 E. Equitable subordination (core) .......................500
 F. Fraud (non-core) .......................................501
 G. Conclusion ..............................................501
III. Order and recommendation ...............................502
IV. Witness Index ...........................................502

---

JO ANN C. STEVENSON, Bankruptcy Judge.

## I. OPINION AND ORDER GRANTING MANUFACTURERS NATIONAL BANK OF DETROIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT.

### A. Introduction.

In the opening act of MACBETH the tragic hero admits of "vaulting ambition which o'erleaps itself." WILLIAM SHAKESPEARE, THE TRAGEDY OF MACBETH, act 1, sc. 7 reprinted in THE RIVERSIDE SHAKESPEARE, at 1317 (G. Blakesmore Evans, ed., Houghton Mifflin Co. 1974). The Plaintiff in the case before the court, Trustee James W. Boyd ("Trustee"), is the last surviving heir of a longstanding suit which casts upon Defendant Manufacturers National Bank of Detroit ("Manufacturers" or "Bank") the am-

bition of Macbeth. The Trustee's claim arises out of the lending relationship between the Bank and the Debtor, Auto Specialties Manufacturing Company ("AUSCO"). In relevant part, the Trustee claims first that the Bank assumed the duty of AUSCO's fiduciary through the outside manager which AUSCO hired at the Bank's request, Benjamin G. Sachs ("Sachs"), a duty which the Trustee says was breached. The Trustee also argues that the Bank's conduct during the workout period after AUSCO's default was egregious. Based upon these claims the Trustee requests this court to subordinate the secured claim of Manufacturers to the claims of unsecured creditors. The Trustee portrays as Duncan the majority stockholder and one-time CEO of AUSCO, Lester Tiscornia ("Lester"), with his son James Tiscornia ("James") assuming the role of the Thane of Cawdor, both of whom were but victims of the Bank's ambition.

This matter is now before us on the Bank's motion for partial summary judgment as to the issue of equitable subordination, yet another wave in the tumult of paper this litigation has generated. The brief supporting this motion alone consumed 221 pages, and it has taken the court endless hours to fully digest the facts and issues involved. However, at the end of this review the court was left with the unmistakable impression that vaulting ambition (and vaulting logic) was the hallmark of the Trustee's claim rather than the Bank's conduct, and that Willy and Biff Loman are more appropriate literary analogs for Lester and James Tiscornia. The path taken by the court to reach this conclusion follows.

### B. Jurisdiction.

 Jurisdiction exists in this matter under 28 U.S.C. § 1334(b), equitable subordination being a core matter under 28 U.S.C. §§ 157(b)(2)(K) and (O). *Randa Coal Co. v. Virginia Iron Coal & Coke Co. (In re Randa Coal Co.)*, 128 B.R. 421, 426 (W.D.Va.1991); *American Cigar Co. v. MNC Commercial Corp. (In re M. Paolella & Sons, Inc.)*, 85 B.R. 965, 969 (Bankr. E.D.Pa.1988); *Bank of New Richmond v.*

*PCA of River Falls, Wisconsin (In re Osborne)*, 42 B.R. 988, 993 (W.D.Wi.1984); *Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.)*, 121 B.R. 166, 189 (Bankr.D.Vt.1990); *Sibarium v. NCNB Texas Nat. Bank*, 107 B.R. 108, 115 (N.D.Tex.1989); *Campbell Sixty–Six Express, Inc. v. Empire Bank (In re Campbell Sixty–Six Express, Inc.)*, 84 B.R. 632, 633 (Bankr.W.D.Mo.1988); *Prudential Lines, Inc. v. U.S. Maritime Administration (In re Prudential Lines, Inc.)*, 79 B.R. 167, 183 (Bankr.S.D.N.Y.1987). Accordingly this court is empowered to issue a final judgment subject only to the appeal right of 28 U.S.C. § 158.

### C. Summary judgment.

FED.R.BANKR.P. 7056 makes applicable FED.R.CIV.P. 56 in bankruptcy cases. That rule provides in part that upon filing of a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED.R.CIV.P. 56(c).

The present motion follows in the wake of a shift in federal practice regarding summary judgment motions generated by three 1986 Supreme Court decisions: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These cases were carefully analyzed in an opinion authored by District Judge William Bertelsman, sitting on the Sixth Circuit by designation, in *Street v. J.C. Bradford & Company*, 886 F.2d 1472 (6th Cir.1989). Judge Bertelsman cited to a number of scholarly works which described these cases as heralding a "new era" in deciding summary judgment motions. From these cases he developed a list of ten new era principles:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Id.* at 1479–80 (citations, footnotes omitted).

The Trustee argued against a strict application of *Street* in this case because at the time this motion was briefed discovery had not yet been completed. However, the parties were afforded the opportunity to complete discovery before oral argument was waived and the court decided this motion. Although the court on September 25, 1991 issued a scheduling order specifically delineating the dates for briefing in regard to this motion, the Trustee in apparent disregard of this order submitted additional evidence by way of a supplemental brief filed June 30, 1992 and a letter dated September 1, 1992. The court has considered these materials even though the Bank was not permitted to file a response in either instance. The Trustee has thus had the full benefit of in excess of four years of discovery, including that which took place after this motion was filed. Accordingly the court finds no reason not to apply the ten *Street* principles directly to this case.

Most courts have concluded that much like obscenity, what constitutes appropriate circumstances for equitable subordination is not susceptible to simple delineation. Courts therefore have to some extent applied a "know it when I see it" test like that adopted by Justice Stewart in another context.[1] Despite the fact-intensive nature

---

**1.** The Justice's memorable words are set forth below to complete the analogy:

I have reached the conclusion, which I think is confirmed at least by negative implication in the Court's decisions since *Roth* and *Al-*

*berts,* that under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to

of equitable subordination claims, summary judgment has at times been appropriate. *See Ashbrook v. Block,* 917 F.2d 918, 926 (6th Cir.1990); *Rosania v. Haligas (In re Dry Wall Supply, Inc.),* 111 B.R. 933, 938–39 (D.Colo.1990); *Stratton v. Equitable Bank, N.A.,* 104 B.R. 713, 730 (D.Md.1989), *aff'd* 912 F.2d 464 (4th Cir.1990) (trustee seeking equitable subordination required to establish "significant, probative facts" that shock the conscience of the court in order to survive summary judgment).

■ In considering a motion for summary judgment in an equitable subordination context other case authorities generally may not be distinguished on the ground that the cited opinion was rendered after a trial on the merits. As stated in *Badger Freightways, Inc. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago (In re Badger Freightways, Inc.),* 106 B.R. 971, 978 (Bankr.N.D.Ill.1989):

> To state a claim for this form of relief, Badger must therefore allege facts which demonstrate the existence of some form of relationship and the corresponding level of misconduct by Continental. The fact that the cases establishing this distinction involved issues resolved after hearings on the merits does not distinguish them. They demonstrate what facts must be alleged and then eventually proven to prevail under § 510(c).

Because this court is compelled by oft-repeated standards of summary judgment to view the facts most favorably to the non-moving party, *Wolotsky v. Huhn,* 960 F.2d 1331, 1334 (6th Cir.1992), for summary judgment purposes, it is *assumed* that the Trustee has already succeeded in proving facts for which there is support in the record. Those facts may be tested against those in other cases found after trial to be insufficient to warrant subordination of a claim.

The court is compelled to make one other observation regarding the ten *Street* princi-

be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

ples. Much of what the Trustee argues is "fact" barring summary judgment is in truth inference and conclusion based upon facts. This is a crucial distinction. If a witness testifies to fact A and fact A is an element of the Trustee's case, then for summary judgment purposes the court must accept that element as proven because fact A is direct evidence of the allegation. On the other hand, if a witness testifies to fact A, and that fact is asserted as proof of fact B which is an element of the Trustee's case, then fact A is circumstantial evidence. In such a case, under the tenth *Street* principle the court is empowered to examine the connection between fact A and fact B and evaluate its plausibility. *See Street,* 886 F.2d at 1480, fn. 21. However, the court has carefully refrained from making judgments of credibility regarding direct evidence offered by the parties.

**D. Statement of facts.**

The facts stated below are derived from the parties' briefs, the exhibits attached to the briefs, the depositions and other documents filed in this case, and the court file. The court, consistent with the ninth *Street* principle, *supra* at 462, has not undertaken a review of the entire record in this case, although the court has exhaustively studied the materials presented by the parties and at times examined portions of the record not specifically relied upon by the parties. In each case in which the court referred to a passage of transcript cited by either party, the court read not only the quoted material, but also the testimony immediately preceding and following that passage in order to understand the context of the statement quoted. Unless otherwise noted, where there is a factual dispute the court has stated the version of the facts most favorable to the Trustee; the court has treated those factual assertions con-

*Jacobellis v. State of Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (footnotes omitted).

tained in one parties' brief but not addressed in the other's as uncontested.[2]

AUSCO was an automotive parts manufacturer based in southwestern Michigan which in its heyday employed almost 2000 workers. At various times it manufactured iron castings for automobiles, and brake components for aircraft and off-road vehicles. At the helm of the company for many years was president, chairman of the board, and majority stockholder Lester. In recent times the balance of the board consisted of Lester's two sons, James, who followed his father as president of the company, and Edward Tiscornia ("Edward"), along with Loren Gerber ("Gerber") and a representative from Manufacturers, who sat on the board at the behest of AUSCO. Lester Tiscornia dep., Vol. III at 363–64. During the period relevant to this case that representative was Jay Bunker. The Bank considered this an extension of his duties as a Bank officer, as evidenced by a memorandum dated August 14, 1979 which was attached to Trustee's counsel's letter to the court of September 1, 1992.

AUSCO had banked primarily with Manufacturers since the Depression. In their depositions the Tiscornias and Gerber noted that over the course of this longstanding lending relationship AUSCO had often looked to the Bank for input on important business decisions and found that advice to be valuable enough that they reposed some trust in the Bank. This evidently was a successful relationship for AUSCO thrived from the 1930's until the 1970's.

Like many other automotive suppliers AUSCO found it more difficult to compete in the late 'seventies and early 'eighties. By 1980 the company faced a major financial crisis which forced it to close its casting division, but this did little to stop the company's slide. Despite a slight upturn in 1984, by 1985 AUSCO had reached its breaking point. It found itself saddled with some $20 million in unfunded pension liabilities, excessive overhead, and relatively flat sales.[3]

To break out of this downward spiral AUSCO proposed a dramatic reorganization which would either revitalize the company or leave it hopelessly mired in debt. Manufacturers wagered that AUSCO would be successful in its reorganization, and in September 1985 the parties closed on an agreement which restructured AUSCO's loans to make available up to $3 million to fund the plan. These loans would come due on August 31, 1991. In addition the Bank agreed to loan an additional $1.84 million to fund the consolidation of AUS-

---

**2.** In this opinion the court will occasionally cite to Manufacturers' brief. This document is referred to as "Bank Brief." The Trustee's first responsive brief is cited as "Trustee's Brief"; his supplemental brief is cited as "Trustee's Supp. Brief." Exhibits to the Manufacturers' brief were contained in two appendix volumes. Bank exhibits are therefore cited as App. [I or II], No. ___. There was also a separate volume for transcript excerpts. The court will not cite to the transcript excerpts submitted by the Bank, preferring to rely upon the actual transcripts (the citation form for depositions is self-explanatory). The Trustee's exhibits will be cited as Trustee's Ex. No. ___.

**3.** The following chart is set forth in a letter from AUSCO to the Commissioner of the IRS dated May 6, 1986:

(in thousands)

| Year | Sales (Net) | Net Income | Employment | Dividends |
|------|------------|------------|------------|-----------|
| 1977 | $76,817 | $ 1,916 | 1.690 | $133 |
| 1978 | 78,958 | 575 | 1.840 | 104 |
| 1979 | 86,958 | 564 | 1.700 | 52 |
| 1980 | 56,495 | (3,802 ) | 1.230 | 52 |
| 1981 | 34,114 | (4,320 ) | .700 | None |
| 1982 | 41,312 | (3,442 ) | .430 | None |
| 1983 | 31,599 | ( 911 ) | .400 | None |
| 1984 | 40,207 | 423 | .400 | None |
| 1985 | 38,875 | ( 105 ) | .425 | None |
| 1986* | 29,833 | (1,744 ) | .450 | None |

*As of April 6, 1986....

App. I, No. 1.

CO's facilities. AUSCO would be required to reduce this loan to an even $1 million by July 31, 1986, and to pay it in full one year later.

The reorganization attempt was a failure; AUSCO defaulted on the payment due in July 1986. The Bank contends, and the Trustee does not dispute, that the failure of the consolidation plan was attributable to AUSCO's management. At that time the Bank was fully secured and could have insisted upon repayment of its loans in full. Had it done so AUSCO would have had to either 1) cease operations as Manufacturers liquidated its collateral, 2) locate an outside buyer to take over the company and pay off the Bank, 3) find another lender to replace Manufacturers, or 4) file bankruptcy. On August 6, 1986 a meeting took place at Manufacturers' Southfield, Michigan offices between James, Manufacturers' vice president David Day ("Day"), and junior loan officer Hugh Porter ("Porter"). The parties disagree on the tenor of this meeting, but agree as to the substance of the message communicated to AUSCO. In order for the Bank to continue the lending relationship, the following steps would have to be taken:

(1) Lester Tiscornia was to be fired;[4]

(2) James Tiscornia was to step aside as President and Chief Operating Officer; and

(3) AUSCO was to hire an outside manager acceptable to the Bank to take James' place.

**4.** Manufacturers states that it insisted upon Lester Tiscornia being removed from the payroll because it understood that he was no longer active in the business. Bank Brief at 69–70. The Trustee states that the Bank immediately demanded that "Lester Tiscornia, CEO and patriarch, must be fired." Trustee's Brief at 18. The Trustee further states that Lester was involved in the day-to-day operation of the business. The court will view the facts most favorably to the Trustee, *Wolotsky*, 960 F.2d at 1334, and for purposes of this motion assumes without deciding that Lester was active in the business but that the Bank nonetheless insisted that he be fired.

**5.** The Trustee raised a general objection to the use of Rose's testimony by the Bank based upon attorney-client privilege. No specific instances of violation of the privilege were identified.

James was unsure whether Manufacturers also requested personal guarantees from the Tiscornias at this meeting, as the Bank maintains, or if this occurred earlier. In any event, the request for guarantees came up during the summer of 1986 and was refused. James Tiscornia dep., Vol. VIII at 780–781.

■■■ The parties do agree that the Bank would not continue its lending relationship with AUSCO if these steps were not taken, although the window dressing varies. The Bank couches this fact in terms of "steps Manufacturers considered important for AUSCO to take if Manufacturers were even to maintain the current lending levels," Bank Brief at 69, while the Trustee uses the term "ultimatum," Trustee's Brief at 19. Either way, there is no dispute that the alternative was that the Bank would enforce its contractual right to seek immediate repayment of some or all of the loans, nor is there any dispute that the Bank had that right. Gerber, Ronald Rose ("Rose," AUSCO's attorney at the time),[5] and all of the Tiscornias except James agreed that outside management would help AUSCO, or at the very least was not an unreasonable request under the circumstances; Lester felt AUSCO "absolutely needed" outside management. Lester Tiscornia dep., Vol. I at 135–136; Gerber dep., Vol. II at 290–91; Rose dep., Vol. I at 93; and Edward Tiscornia dep., Vol. II at 193–94.

The court interprets the Trustee's failure to raise objections to specific deposition passages as a waiver of the privilege. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (trustee has the power to waive privilege regarding prepetition communications). It is not the court's task to scour the deposition transcripts for objections.

The court also notes that the privilege is applicable only to communications between client and attorney. *See United States v. Goldfarb*, 328 F.2d 280, 281–82 (6th Cir.), *cert. den.* 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964). In order to remove any controversy as to this issue, the court has relied upon the testimony of Rose only when that testimony did not relate to communications between AUSCO and its attorney.

AUSCO acceded to Manufacturers' demand/ultimatum/request/suggestion. At the August 6, 1986 meeting, said James, "I asked them [the Bank] if they would supply me a list of candidates that would be acceptable to them, and he [Day] acknowledged the fact that they would." James Tiscornia dep., Vol. II at 211. Two names were provided: Ray Fountain ("Fountain") and Sachs. AUSCO interviewed and considered both of these men, but Sachs was ultimately hired.[6]

Sachs' prior experience in turnaround situations included a stint at Standard Tube of Detroit, Inc. ("Standard Tube"). Standard Tube was purchased by Sachs and his partner from Quanex Corporation, of which it had been a division. The acquisition was financed by Manufacturers. Standard Tube reported losses for the three years preceding Sachs' involvement. The company then turned profitable for a time, but ultimately failed. App. II, No. 58 at 4–5. Sachs disclosed this to Rose in August of 1986. Rose dep., Vol. II at 306. Manufacturers contends, and the Trustee does not deny, that the Standard Tube failure was the combined result of a downturn in the steel industry and labor difficulties experienced by the company, rather than any collusive effort by Sachs and the Bank. It is also undisputed that before Standard Tube closed the Bank debt was paid in full.

The Trustee contends that the Bank concealed from AUSCO the fact that Standard Tube failed while Sachs was at the helm.

Trustee's Brief at 52–53. However, the court is unable to glean from the record any evidence of a specific intent to prevent AUSCO from learning about Standard Tube; the most that the record will support is that Manufacturers did not disclose anything about Sachs' time there, except to state that the Bank was satisfied with the work that Sachs had done at other companies generally. The Trustee reasonably interprets this statement as also meaning that the Bank was satisfied with Sachs' work at Standard Tube. However, the Trustee does not offer any evidence that this statement or any other attributed to the Bank was false. To the contrary, the very passage upon which the Trustee relies to found his claim of concealment contains an affirmative statement that the Bank was truthful with AUSCO in responding to its inquiries regarding Sachs:

Q: [By Richard Kay] And what do you remember being told [by the Bank about Sachs and Fountain]?

A: Just pretty much along the line, where they worked at and that Sachs had had some experience with bankruptcy and had done, apparently, a satisfactory job at the other places, as far as the bank was concerned.

Q: Did you ever learn that anything that the bank had told you about Sachs or Fountain was untrue?

A: No, not specifically, no.

Gerber dep., Vol. V at 693–94.

Before Sachs was hired AUSCO requested that Rose do some independent back-

---

**6.** The Trustee has submitted pages from Sachs personal calendar to show that he was meeting with representatives from Manufacturers during the same time frame that he was recommended to AUSCO. Trustee's Supp.Brief at 3–4. The Trustee seeks to infer from this that Manufacturers and Sachs were plotting against AUSCO, or at least that Manufacturers would tolerate no other turnaround expert than Sachs. This court will draw no such inference. AUSCO asked Manufacturers to recommend a turnaround expert; it recommended someone with whom it had had dealings. The fact that it may have had dealings with that person in the same time frame as the making of the recommendation is an entirely innocent fact. It would take on the ominous significance the Trustee attempts to ascribe to it only if there were additional *facts* to show that those meetings involved some wrongful conduct toward AUSCO. The best the

Trustee could do in this regard was to make an unsupported suggestion that neither Sachs nor Manufacturers explained what these meetings were about. In making this suggestion, however, the Trustee has failed to establish that either was ever asked for an explanation.

The Trustee's supplemental brief is replete with similar innuendo without support. For example, the Trustee cites the fact that Manufacturers did not transfer this account to its Loan Control Department until Sachs was fired. However, nowhere does the Trustee tell the court what criteria the Bank used for making such a transfer, or what significance the Bank attached to the location of the account. Essential facts necessary to the Trustee's conclusion are again missing.

There is a difference between factual support for an allegation and hyperbole.

ground investigation regarding Sachs' credentials. Rose discussed Sachs' qualifications with Sachs' attorney and with an accountant at Price Waterhouse (AUSCO's accounting firm) who was familiar with Sachs, both of whom gave Sachs positive reviews. Rose dep., Vol. I at 74–75.

There is a dispute between the parties as to why Sachs was hired. The Bank maintains that Sachs was hired because of his previous chapter 11 experience and his dealings with the Pension Benefit Guaranty Corporation ("PBGC") in workouts. The Bank cites testimony from Gerber, Lester, and Rose in support of this contention. Bank Brief at 84–88. The Trustee takes the view that AUSCO hired Sachs because it was forced to do so by the Bank. This stance is premised upon Fountain's requirement (as related to James by James Embree ("Embree"), another commercial loan officer who was filling in for Day) that Fountain be sold or granted a controlling interest in the company:

> [Embree] indicated that ... Mr. Fountain's present requirement was [that] he be allowed to acquire a controlling interest in the company that he was going to join, or, if he were to join a company, it would require that he be allowed to purchase or be granted a controlling interest, that he was not sure that that would fit with the family's desires....

James Tiscornia dep., Vol. VIII at 842. Based upon this testimony the Trustee concludes that 1) Fountain was unacceptable to AUSCO; 2) the Bank knew that Fountain was unacceptable and 3) the Bank therefore suggested Fountain's name merely as a sham to hide the fact that it was forcing AUSCO to hire Sachs. Trustee's Brief at 29.

Sachs' original contract with AUSCO was for a six month period commencing September 15, 1986. Compensation was to be $100,000 for this period, and Sachs was to devote two days a week to management of the company. His position would be that of president and CEO. Donald Buchanan, a member of Manufacturers' Loan Policy Committee, testified that up until the time of his deposition he thought that Sachs had been hired as a consultant, rather than CEO. He further testified that normally the name of such a consultant would be suggested to the company, but it would be up to the company to decide what role that person would fill.[7] Buchanan dep. at 30–33, 37–38. Rose and the directors of AUSCO mutually reached the decision that Sachs would become president and CEO, and that Lester would remain as chairman of the board of directors. Lester Tiscornia dep., Vol. III at 349–350. Lester explained that he felt it imperative that Sachs have full control if the turnaround attempt were to succeed. *Id.* at 408–409.

In October 1986 Jay Bunker resigned from AUSCO's board. Bank Brief at 14. No testimony was offered to show that Bunker had taken part in the day-to-day management of the company, or in the decision to hire Sachs.

AUSCO showed a profit for four of the first six months of Sachs' tenure. App. II, No. 56. Lester Tiscornia, chairman of the board and patriarch, testified that at this point in time he was generally pleased with Sachs' performance. Lester Tiscornia dep., Vol. II at 262. However, he was concerned about the strained relations between Sachs and James. Lester testified that he advised Sachs to resolve the dispute as he saw fit:

> Q: [By Richard Kay] What was [Sachs'] specific complaint about a lack of support from Jim Tiscornia?
>
> A: Well, I think at that particular point in time he felt he wasn't getting the

---

7. The Trustee relies upon this testimony and that of Ted Winiarski, another Bank officer, to suggest that the Bank acted improperly by suggesting Sachs name for a specific position, *i.e.* president and chief executive officer. The flaw in this argument is that again there is a gap in the chain of facts which the Trustee must prove to reach this conclusion. Specifically, there is no testimony to show that the Bank insisted that the outside manager hired by AUSCO be given any specific post. In fact, Buchanan testified that the Bank did not care one way or the other what role the turnaround expert played: "It was up to the company to hire who they wanted and for what role they wanted. Whether they wanted to keep him as a consultant or give him a title, I don't think it makes any difference." Buchanan dep. at 28.

full support of the executive vice president.

Q: Did you reach any opinion on that yourself?

A: The only thing I told Mr. Sachs early in the game, that if Jim couldn't do the job, he was at liberty to replace him. I never protected anybody.

*Id.* at 262–63.

James had his own reservations regarding Sachs, whom he felt had cut him out of the loop in AUSCO's management. On December 19, 1986 a meeting took place between AUSCO's management, Rose, Bank representatives, and Sachs. James Tiscornia dep., Vol. XII. at 1239. At the meeting the parties discussed additional advances by the Bank, *id.* at 1240, additional capital expenditures, *id.* at 1241, amortization of the Bank's loan, *id.* at 1244, and the need to maintain current management, *id.* at 1250. James testified that at this point in time he was not entirely satisfied with Sachs' performance:

Q: [By Richard Kay] ... At this point in time, that is, December 19, 1986, were you satisfied with the performance of Mr. Sachs as president of Ausco?

A: Not in total, no.

Q: Why were you dissatisfied in any way?

A: I didn't believe that he had done some of the things that he had originally indicated to me that he was going to do.

Q: What things?

A: Primarily, that he was going to leave me as executive vice president and work through me to the operating managers to accomplish what he felt needed to be done.

*Id.* at 1251–52.

For purposes of this motion the court accepts that James was cut out of the chain of command by Sachs. However, when the Bank stated that current management should be maintained, James did not air his complaints with Sachs:

Q: [By Richard Kay] Did you, in this meeting with Mr. Day and Mr. Diehl [outside counsel for the Bank] and Mr. Porter on December 19, 1986, express your dissatisfaction with Mr. Sachs' performance?

A: No, I did not.

Q: Did you make any complaints to them about Mr. Sachs?

A: No, I did not.

*Id.* at 1253.

Sometime after the December 19, 1986 meeting negotiations commenced between AUSCO and Sachs for a second management contract to follow the first, which was to expire in March 1987. In the course of these negotiations Sachs asked for a cash bonus of $500,000.00 at the beginning of the contract term. This proposal received a less than enthusiastic response by Gerber and the Tiscornias. However, Sachs took the position that the bonus was necessary if AUSCO wanted to keep him. Lester Tiscornia dep., Vol. II at 237. At this point AUSCO began to consider other options:

Q: [By Richard Kay] I'm asking whether or not you had an understanding of what the bank's position was on a bankruptcy for Ausco as of February 1987.

A: [By James Tiscornia] My, understanding, at that point, was that the bank would have supported us in bankruptcy.

Q: The next question shown in Mr. Gerber's notes, under bank position is, quote, will they accept another professional manager if we cannot reach agreement with Ben. Have I read that right?

A: That's what it says.

Q: Did you ever ask the bank, in February of 1987, whether the bank would accept another professional manager if Ausco could not reach agreement with Mr. Sachs?

A: Not that I recall.

Q: Did you ever do that at any time after February of 1987?

A: Not that I recall.

Q: Are you aware of anyone, on behalf of Ausco, in February of 1987 or thereafter, asking the bank if they would

accept another professional manager if Ausco couldn't reach an agreement with Mr. Sachs?

A: Not that I recall.

James Tiscornia dep., Vol. II at 1339–40. James explained why he did not ask the Bank whether it would accept another manager:

A: I did not ask the question, because my perspective of the position—my position, at that time, was that the bank had instructed me to follow Mr. Sachs' instructions, and if I didn't do that, that I was to be fired. And I viewed that kind of a question as a statement, on my part, that I was not following instructions.

Q: [By Mr. Kay] How so?

A: That the bank would view that as me not cooperating.

*Id.* at 1340–41. This testimony was offered by the Trustee in support of his allegation that the Bank would not permit AUSCO to fire Sachs.

The Trustee presented testimony of Gerber for the same point:

Q: [By Richard Kay] Mr. Gerber, did you understand, as a member of the board of directors, that, after Ben Sachs was hired by Ausco, that the board, under its bylaws, had the power to remove Ben Sachs as C.E.O. of Ausco?

. . . . .

A: My understanding of the circumstances, back then, was that, regardless of what the bylaws said, that the board of directors did not have the power to remove Ben Sachs.

Gerber dep., Vol. I at 157–58. The Trustee did not cite Gerber's explanation as to how he reached this understanding, but that portion of the transcript reveals that Gerber was merely parroting what he had been told by the Tiscornias:

Q: [By Richard Kay] Did you have an understanding of what the bylaws said?

A: Yes, I read the bylaws.

Q: What did the bylaws say?

A: Well, I can't quote you specifically what they say, but I assume that they indicate that the board—that the directors have them. But as a practical matter, we had the power to remove him, but the feeling that I received from the other board members was that, if we did that, the bank would probably pull the loan.

Q: Who gave you that feeling?

A: The Tiscornia family.

Q: Who?

A: Jim and Lester.

Q: And on what basis—

A: I don't know what basis they felt that.

Q: So your understanding was just based exclusively on what you had heard from Jim and Lester?

A: The feelings that they expressed.

Q: They never related to you having been told anything to that effect by representatives of the bank?

A: They indicated a concern that that would happen. They did not relate who had told them that.

Q: Or that they had been told that?

A: No, I don't know that they ever relayed they had been told that.

*Id.* at 158–59.

Other passages from Gerber's deposition were also offered to show that the Bank would have called its loan if AUSCO had fired Sachs. *See* Gerber dep., Vol. XIII at 1912–13, 1922–23. However, all of this testimony relates to Gerber's beliefs in November 1987.[8] Gerber did believe that AUSCO could not fire Sachs in early 1987, but the compulsion came from the PBGC, not the Bank:

Q: [By Richard Kay] Did you feel, in November of 1987, that Ben Sachs' employment at Ausco was continued because Ausco felt that the P.B.G.C. wanted Ben Sachs continued?

A: Well, that was the initial feeling in February, I think, or the early part of '87. I didn't feel, personally, as

---

**8.** By that time the Bank had made it clear that AUSCO could fire Sachs. *Infra* at 473.

strongly about that part at the end of—in the fall of '87.

*Id.* at 1915. He admitted the belief that the Bank required Sachs to remain in place was not founded on any statement to him by a Bank officer:

Q: Was there ever a time, directly, when any representative of the bank, in talking or dealing with you, expressed to you that Ben was required to continue as C.E.O. at Ausco in this time frame, March of '87 through November of '87?

A: Not in those words, no.

Q: Or in any words similar, like—

A: No.

*Id.* at 1922.

James' testimony reflects his understanding of the Bank's position regarding Sachs; Gerber's testimony reflects other assumptions he or the Tiscornias made. Neither of these statements are premised upon any affirmative statement by the Bank. The closest the Trustee comes to an affirmative statement made by the Bank is this statement by Lester:

That, for the bank to continue to go along with us, their financing, to try to work this thing out with us, that it was almost imperative that we retain Mr. Sachs. We got that message loud and clear many times. And Mr. Sachs led us to believe that, if we didn't retain him, the bank would pull out from under us.

Lester Tiscornia dep., Vol. V at 791.

Rose recounted more directly what the Bank itself said:

Q: [By John Anding] In the context of the renegotiations of both the credit facility and Mr. Sachs's contract as chief executive officer did the bank openly make known to you that the company could go out and secure some other consultant if it chose to?

A. The bank made—I think it was Dave Day that said this 93 times, "I don't want the sons running the company; I want professional management." He never said who it had to be.

Q: And my question is, did the bank in your discussions with them say, "we want outside management; it does not

have to be Mr. Sachs and we invite you to go out and find someone else if that's your desire"?

A: That's my recollection, that they were very, very positive about saying that, because Lester had particularly had some problems that he expressed to the bank about the price that Ben brought on the situation, the price on other things, other complaints.

Rose dep., Vol. IV at 541–542.

In early March 1987 the AUSCO board reached a tentative agreement with Sachs to hire him for a term of two years at a base salary of $312,000.00. Sachs was to devote three days a week to the business, and was to receive a $500,000.00 cash bonus at the commencement of the contract. However, payment of the bonus was contingent upon Manufacturers loaning AUS-CO the funds, as the company did not have the money on hand to pay it. On March 9, 1987 a meeting took place between the AUSCO board, Embree and other Bank officers, and Sachs. Until this time the Bank had not been involved in the negotiations between AUSCO and Sachs. Lester Tiscornia dep., Vol. II at 235. Lester explained that the purpose of the meeting was to inquire whether the Bank would be willing to fund the bonus:

Q: [By Richard Kay] If I understand the situation right, as of this March 9 meeting with the representatives at the bank, the preliminary agreement called for Mr. Sachs to get a bonus up front in cash of $500,000?

A: Correct.

Q: And you didn't like that very much, did you?

A: I didn't see how we could afford it.

Q: You did not, that is, Ausco did not have the money to pay a $500,000 up front cash bonus to Mr. Sachs, did it?

A: No.

Q: But he was insisting on it, right?

A: Right.

Q: Was this meeting with the bank representative, Mr. Embree, on March 9, 1987, held at Ausco's request?

A: My recollection, it was Ben Sachs' request.

Q: Did you understand that a purpose of the meeting on March 9, 1987 with the bank was to present to the representative of Manufacturers Bank what Ausco would need in order to keep Ben Sachs as its manager?

A: Yes.

Q: As far as you were concerned, what was the purpose, Ausco's purpose, in meeting with Mr. Embree of the bank on March 9, 1987?

A: The purpose was to find out how we could find $500,000 up front for Ben Sachs.

Q: In order to keep him?

A: In order to keep him.

Q: You, that is, Ausco, in the meeting was asking if the bank would loan Ausco that money?

A: It is one way of putting it.

*Id.* at 235–237.

At the end of the general meeting, Lester and Edward asked for a private meeting with Embree. In this smaller conference the two board members expressed their reservations regarding the amount of compensation Sachs was seeking:

Q: [By Richard Kay] And, additionally, was it your hope that the bank would say no?

A: That is why we went to see Mr. Embree.

Q: You hoped that the bank was going to say what? What did you want the bank to say?

A: Wanted the bank to say that this is out of reason, 500,000 up front, it was not reasonable. Mr. Embree said this is not unusual for turnaround guys.

Q: Was it your hope that because the bank would refuse to loan the $500,000, that you could negotiate a lower figure with Mr. Sachs?

A: Yes or—

Q: What did you want to get Mr. Sachs down to for a bonus?

A: We didn't think he was entitled to anything up front.

*Id.* at 237. Lester also told Embree he did not think that AUSCO could afford the bonus Sachs had requested.

Edward confirmed that their purpose in meeting with Embree was not to express dissatisfaction with Sachs' performance, but to voice their concerns regarding the compensation package:

Q: [By Richard Kay] ... You didn't debate with Mr. Embree the need for professional management in this meeting?

A: I don't recall doing that, no, sir.

Q: And you didn't debate with Mr. Embree the concept of continuing Mr. Sachs as the professional manager?

. . . . .

A: I do not recall debating the concept of keeping Mr. Sachs as a professional manager.

Q: It was the concept of this amount of money that would be required, as you saw it, that you debated?

A: Yes, a substantial amount of money for a few days a week, yes.

Edward Tiscornia dep., Vol. III at 481–482.

To the Tiscornias' surprise, Embree did not react as negatively as they had expected. Embree instead told them that the compensation was not unusual for a turnaround expert and indicated that the Bank supported Sachs. Lester Tiscornia dep., Vol. I at 168.

Lester testified that he thought the Bank would not continue its lending relationship with AUSCO if Sachs' contract was not extended. Although he testified at first that Embree made such a statement outright, he then testified that his belief was not based upon any direct statement by Embree:

Q: [By Richard Kay] Embree did not tell you, in the March 9 meeting, that he was going to call the loan if you didn't extend the Ben Sachs contract?

A: He certainly intimated that.

Q: How?

A: By telling us that Ben Sachs was a turnaround artist and that he was the guy that could do the job for us.

Q: Did he say, I'm going to—

A: That the bank was not—and I don't know, but I would assume that he was telling us that the bank was not in a position or did not have anybody that they could recommend to us if we did not renew his contract.

Q: You assumed that?

A: Right.

Q: He didn't tell you that?

A: I don't recall that he actually said that.

Lester Tiscornia dep., Vol. I at 172.

Edward also believed that the Bank did not want AUSCO to fire Sachs based upon its support for him, but was equally vague regarding any explicit statement by Embree to this effect:

Q: [By Richard Kay] Do you recall whether Mr. Embree gave you any indication, in this private meeting, about what the bank's position would be if Ausco decided not to reemploy Mr. Sachs?

A: I just—again, I just recall the part of the conversation where—where we talked about the fact that Mr. Sachs was a turnaround guy, that he—that he was held in, if you will, high esteem at the bank, that he had done some other things for the bank and that—that he felt that Sachs was the right guy for Ausco.

Edward Tiscornia dep., Vol. III at 478–79.

During this same period AUSCO was looking at alternative managers to Sachs. A professional search firm was contacted in early 1987. Gerber dep., Vol. V at 655. In February 1987 AUSCO contacted George Snellgrove, whose name had been given to Lester as a turnaround specialist by Ted Troff, Lester's attorney. Lester Tiscornia dep., Vol. II at 216–217. AUSCO was interested enough in Snellgrove that he and his wife were invited to the St. Joseph facility during the weekend of March 13, 1987. Edward Tiscornia dep., Vol. VIII at 1125–26. During this same period Fountain was contacted again, but he had already taken a position and was unavailable. Gerber dep., Vol. V at 667.

After the March 9, 1987 meeting the Bank was included in further negotiations regarding the employment contract so that the bonus issue could be resolved. Rose testified that since AUSCO had already agreed to pay the bonus he did not take an active role in the negotiations. On the other hand, he characterized the negotiations between Sachs and the Bank as "acrimonious," and he found himself in the role of "referee" between the other parties. Rose dep., Vol. II at 302.

The agreement finally struck is detailed in the "infamous 'incentification' memo," Trustee's brief at 34, an internal Bank document authored by junior loan officer Hugh Porter:

As the company has insufficient working capital to pay Sachs [the bonus] money, we have been approached with a request to provide the money. Under the authority of Bob Hughes, we have agreed to effectively provide $400,000, the form of which will be described momentarily. The other $100,000 will come out of the company's working capital. After various gyrations, it appears the form we have settled on for providing the $400,000 will be a $400,000 irrevocable letter of credit. Mr. Sachs will only be able to draw against the letter if certain specific goals we have established for the company are met. More specifically, he will be able to draw $150,000 after the indebtedness under the liquidation facility note (the reducing revolver) has been reduced to $500,000 from its current balance of $1,598,000, the inventory reliance has been reduced to $500,000, or all Bank debt has been retired. He will be able to draw the final $250,000 when the liquidation facility note is further reduced to $200,000, the inventory reliance has been reduced to $200,000, or all Bank debt has been retired.... The reality of what we are agreeing to is that we are significantly incentifying Mr. Sachs to reduce our exposure well beyond the amount he is getting out of the company in addition to making his ability to get anything out of the company contingent on our reduced exposure.

Trustee's Ex. No. 15 at 1. Although the letter of credit was to be irrevocable, it

would expire by its own terms in June 1989. This arrangement was approved by AUSCO in a board meeting held on April 14, 1987.

At the same time the bonus arrangement was negotiated the Bank and AUSCO also reviewed their underlying lending relationship. Since July 1986, when AUSCO defaulted on the consolidation loan, AUSCO had made only interest payments on its obligation to the Bank. AUSCO had continued in default during this period, and the Bank had the right to insist upon immediate repayment of its loans. The Bank did not require full payment in April 1987, however. It instead agreed to renew AUSCO's two outstanding loans and continue its forbearance in exchange for a ¾% increase in the applicable interest rates. The Bank also required AUSCO to begin making principal reduction payments in the amount of $50,000.00 per month.[9] Both of the renewal loans were due on a demand basis. An amendment to the parties' September 11, 1985 loan agreement which memorialized the new financing terms was executed by AUSCO on April 14, 1987. App. I, No. 33. A new promissory note was signed on April 30, 1987. App. II, No. 37.[10]

The PBGC responded strongly to the new arrangement between the Bank and AUSCO in a May 13, 1987 telephone conference between Rose, Gerber, Sachs, representatives from Price Waterhouse, and Robert Klein ("Klein") of the PBGC. Klein took the position that the Bank was oversecured and that therefore the principal reductions of $50,000.00 per month were unreasonable. According to Rose, however, AUSCO and its representatives responded

that the company thought that the Bank was being reasonable. Rose dep., Vol. III at 355–57.

Negotiations with the PBGC continued forward during the balance of 1987. But during this same period the performance of AUSCO began to slip again. As a result Lester became increasingly dissatisfied with Sachs' performance. Lester Tiscornia dep., Vol. I at 116–121. On October 28, 1987 he called Day, who had resumed responsibility for Manufacturers' AUSCO account. Lester testified that before he called Day he believed that the Bank, and not AUSCO, controlled Sachs. *Id.* at 158. Day disabused him of this concept in no uncertain terms. He informed Lester that Lester still had the power to control Sachs and to push him for a plan. Day further stated that he too had concerns about Sachs' performance. From this point forward, Lester knew that he and not the Bank controlled AUSCO. *Id.* at 158–63.

Although AUSCO's performance up to October 1987 had been disappointing, the company had not passed the point of no return. An October 29, 1987 report authored by A.D. Little, Inc., a consultant to the PBGC, concluded that AUSCO was still capable of a return to profitability. At about the same time however, AUSCO began increasing the amount of its trade payables by negotiating extended credit terms with its suppliers. App. II, No. 42. According to a memorandum authored by Robert Fletcher, an AUSCO executive vice-president, AUSCO justified this to its creditors as being necessary until AUSCO's problems with the PBGC were resolved and new financing to take out Manufacturers was in place. App. II, No. 45. The PBGC

---

**9.** The court finds the argument that the Bank's claim should be equitably subordinated because it required principal reduction payments on a loan in default utterly preposterous. Trustee's Brief at 41, fn. 24. Incredibly, the Trustee describes these payments on a restructured debt which had been in default for nearly a year as "over-speedy." By the terms AUSCO agreed to when it first committed itself to repaying these funds, these principal reductions were long overdue and far too small in amount.

**10.** The documentation provided to the court appears to be incomplete. The court does not

have before it in connection with the filings on this motion a copy of the April 14, 1987 loan amendment agreement which is executed by Manufacturers, nor does it have a copy of the renewal line of credit note. Both parties appear to be operating under the assumption that the documentation was completed, and so the court will also make this assumption based upon the record provided. It is quite possible that copies of these documents are located elsewhere in the court's file, which for this adversary proceeding alone occupies in excess of fifteen feet of file space.

claim was settled in March 1988, but no take-out financing was located before AUSCO filed chapter 11 bankruptcy.

In January 1988 AUSCO approached Manufacturers for a $3 million loan for capital improvements. This request was flatly refused by the Bank. Lester Tiscornia dep., Vol. I at 105–06. At about the same time the Bank informed AUSCO that, although it was not going to call its loan immediately, AUSCO would have to find a new lender. *Id.* at 106–08.

In early February 1988 AUSCO began to experience a severe cash flow crisis. *Id.* at 99. The company concluded that it would have to either obtain additional financing for operations or it would be unable to make its trade payables. In practical terms, if additional funds were not forthcoming, the company would either have to shut down or file bankruptcy. *Id.* at 100.

At about the same time Manufacturers agreed to a restructuring of its financing commitment with AUSCO in order to provide for a transition to a new lender. On February 9, 1988 AUSCO and the Bank executed a second amendment to the September 11, 1985 loan agreement. Trustee's Ex. No. 16. In this agreement AUSCO's line of credit was increased by $600,000.00 to $2,600,000.00. At the same time a modification to the letter of credit to Sachs was made. Even though the benchmarks previously agreed upon between AUSCO, the Bank, and Sachs had not been reached, Sachs was allowed to draw down $300,-000.00 on the letter of credit.[11] The modification of the letter of credit was approved by a unanimous vote of AUSCO's board. James Tiscornia dep., Vol. XV at 1812. The payment of the letter of credit was accompanied by the payment of $300,000.00 to AUSCO by GT Associates, an entity controlled by the Tiscornias, in satisfaction of obligations it owed to the company. This money was in turn paid to the Bank.

The Bank's brief contains no discussion of the $300,000.00 payment to Sachs and the concomitant transfers between GT Associates, AUSCO and the Bank. The Trustee's brief discusses the fact that the board of AUSCO approved payment on the letter of credit and draws some conclusions from the fact that the payment on the letter of credit took place. Nowhere, however, does the Trustee explain the mechanics of the transaction or its relationship to restructuring the Bank debt. In search of a better understanding of this transaction the court has therefore turned to the briefs filed by both parties regarding the Bank's pending motion for summary judgment with respect to the Trustee's preference claim (not addressed in this opinion), Sachs' brief in support of his motion to partial summary judgment and the Trustee's response, and the Trustee's supplemental brief in this matter. In the preference brief the Bank maintains that the payment by GT Associates to AUSCO and from AUSCO to the Bank was a precondition to the Bank's assent to the modification of the letter of credit; the Trustee disputes this. The characterization of this episode by the litigants is divergent, but all appear to agree upon the basic transactional facts stated above.

The Trustee portrays this as a most nefarious transaction forced on AUSCO by Manufacturers. There is scant factual support for this allegation, however. AUSCO's severe cash flow crisis is the explanation for its interest in the transaction, which enabled it to obtain an additional $600,000.00 on its line of credit. Sachs also had an obvious interest in having the bonus paid. The Bank, however, gained little, if anything. Its loan was fully secured, so it was assured of repayment if AUSCO collapsed.[12] Its exposure on the letter of

---

11. The Trustee states in his brief, without citation to any supporting evidence, that Sachs was allowed to draw down upon the letter of credit in June 1988. Trustee's brief at 41. This appears to be a typographical error. *See* James Tiscornia dep., Vol. XV at 1812; Trustee's Ex. No. 16.

12. The Trustee points out that the Second Amendment to the Loan Agreement recites that AUSCO has agreed to use its best efforts to find alternate financing. Undoubtedly it was true by this time that the Bank wished—fervently—to end its relationship with AUSCO. As Lester testified, the Bank had made this wish known to him in January 1988. *Supra* at 474.

credit at that time was contingent on its debt being reduced to a level at which the Bank would have virtually no assets at risk with AUSCO, so the surrender of the letter of credit was of little benefit. The payment on the letter of credit was in fact a wash for the Bank as a result of its receipt of the GT Associates money. The $600,-000.00 loan was to allow AUSCO to continue operations while it looked for a lender to replace the Bank, Trustee's Exhibit No. 16, which would have been a benefit to the Bank in that it would have saved the Bank the trouble of liquidating AUSCO's assets.

The best proof that the Trustee has to offer regarding AUSCO's motivation in agreeing to the modification of the letter of credit was this passage from James' deposition:

Q: [By Richard Kay] Who negotiated this agreement for Mr. Sachs to draw down on the letter of credit on behalf of Ausco?

A: My understanding is that Mr. Sachs and the bank negotiated that agreement amongst themselves.

Q: Did Attorney Ron Rose participate in negotiations on that subject on behalf of Ausco?

A: I don't know the answer to that question.

Q: Who negotiated with Mr. Sachs on this subject on behalf of the board of directors?

A: I did.

Q: Did Mr. Rose assist you on that?

A: No, he did not.

Q: Did anyone else negotiate with Mr. Sachs, on behalf of the board of directors, besides yourself, on the subject of his drawing down on the letter of credit?

A: Not that I presently recall.

Q: Did you reach agreement with Mr. Sachs that he would be able to draw down on the letter of credit?

A: I did not, no.

Q: Did you vote on that issue as a director?

A: Yes I did.

Q: And how did you vote?

A: I voted affirmatively.

. . . . .

Q: Why did you vote in favor of having Mr. Sachs draw down on his letter of credit?

A: Because I had been threatened by Mr. Sachs, and because I trusted the bank would continue to give us trusted financial advice.

James Tiscornia dep., Vol. XV at 1806–07.

This refrain, sung by the Trustee to explain AUSCO's directors' acquiescence in the 'foisting' of Sachs upon the company, to excuse their failure to object to the payment of a bonus that in hindsight they decried as exorbitant, and to justify their passivity during Sachs' allegedly incompetent reign even after Day told Lester that he, not the Bank, had the power to control Sachs, has by this point worn a bit thin. What magnificent power was it that Sachs wielded over James Tiscornia that caused James to fear his wrath even after "the patriarch" Lester had been informed that he, not Sachs, controlled AUSCO? Upon what basis did James repose his trust in the Bank which had, according to the Trustee, visited all these evils upon AUSCO over the preceding two years?

Q: [By Richard Kay] Did anyone from the bank threaten Ausco, in any way, if the directors did not agree to allow Sachs to draw down on the letter of credit?

A: Yes.

Q: Who?

A: I don't know specifically who.

Q: What is your understanding, or what did you hear?

A: My understanding was that, if this transaction didn't go through, that, in the event the company went into a chapter filing, the bank would not participate in being our lending facility in the Chapter 11. And in that context, without another lending institution set up, it was very possible the corporation would not continue to exist.

Q: Upon what was your understanding based?

A: Would you clarify that question?

Q: Yes. I'm saying, why were you thinking that that was the case?

A: That's what I was being told.

Q: By who?

A: By Mr. Sachs.

Q: Anyone else?

A: Not that I can presently recall.

*Id.* at 1808–09. The court assumes that James did indeed trust the Bank, and that Sachs did indeed threaten that the Bank would pull out if AUSCO failed to agree to modification of the letter of credit, because these are the direct facts which this testimony establishes. However, the conclusion that the Bank would actually pull out as represented by Sachs is a fact for which this testimony is merely circumstantial support. This court finds this conclusion implausible: no evidence has been offered by the Trustee to demonstrate that the Bank stood to benefit from payment on the letter of credit to Sachs.

Throughout this period AUSCO continued to stretch its trade payables. Lester testified that from October 1987 to June 1988 trade payables increased more and more. Lester Tiscornia dep., Vol. I at 96. He also testified that throughout this period of time he wanted and expected Sachs to continue operating the company. *Id.* In the board's view, bankruptcy was not an acceptable alternative. *Id.* at 92. So in the meantime AUSCO stretched its payables— farther than it should have, in Lester's view. *Id.* at 96.

As the trade payables increased so too did the Tiscornia's dissatisfaction with Sachs. By June 1988 they had decided to fire him. Lester was not sure whether he consulted with anyone at the Bank about this decision, nor does he recall anyone else from AUSCO doing so. *Id.* at 59–60. The only recollection he had of informing the Bank of AUSCO's decision was a phone conversation in which he mentioned to Day that Sachs was not doing his job. *Id.* at 62.

The PBGC had considerably more input in the decision to fire Sachs than did the Bank. Lester specifically recalled talking to Klein regarding the PBGC's position regarding Sachs' termination. Klein told him that he was "a hundred percent" behind Lester's decision. *Id.* at 51. Manufacturers did not object when on June 30, 1988 AUSCO carried out its decision to fire Sachs. *Id.* at 60. Very shortly thereafter Sachs sued AUSCO in state court for breach of his employment contract. This litigation ultimately spread into the conflagration now before us.

AUSCO hired David Stuebe ("Stuebe") to replace Sachs as its president and CEO. The company decided to hire Stuebe after it concluded that it would fire Sachs. *Id.* at 62. By this point in time, Lester was the only member of the board of directors, James and Edward having resigned at the behest of the PBGC. Bank Brief at 149. The decision of what compensation package to offer Stuebe was made by Lester, the one man board; George Hofmeister ("Hofmeister"), who was sponsored by the PBGC to represent it on the board but never took that position; and Klein. Lester Tiscornia dep., Vol. I at 63. They decided that an annual salary of $300,000.00 and a 25% equity stake in the company would be appropriate. *Id.* at 62. Klein and Hofmeister both interviewed Stuebe. *Id.* at 65–66. Lester did not recall whether anyone at the Bank had been consulted regarding Stuebe's hiring; the Bank did not object when he was hired. *Id.* at 67–68. Indeed, an internal Bank memorandum dated July 13, 1988 gives Stuebe a positively glowing evaluation. Trustee's Supp. Brief, Ex. B at 2.

Shortly after being hired Stuebe proposed a turnaround plan for AUSCO. This plan included yet an additional $400,000.00 increase in its line of credit with Manufacturers which AUSCO had obtained in order to pay its vendors. App. II, No. 48 at 3. According to the Bank memorandum the Bank agreed to this additional funding "based on the Bank's long term relationship with AUSCO, our favorable impressions of new management, and the Bank's interest in avoiding Chapter 11." Trustee's Supp. Brief, Ex. B at 5. Again the Bank chose to keep AUSCO afloat even though it did not have to.

However, the additional funding and Stuebe's turnaround plan did not halt AUS-

CO's downward slide. On October 3, 1988, AUSCO filed for chapter 11 protection with this court. Sachs' state court complaint and the counterclaim which it had drawn were removed to the bankruptcy court for the Eastern District of Michigan and subsequently transferred to this court. A second complaint raising similar issues was filed by AUSCO in this forum, which by subsequent amendment was expanded to include Manufacturers. This complaint and its various successors asserted numerous claims against the Bank, of which only equitable subordination is presently before the court.[13] This suit has survived the sale of the operating assets of AUSCO, the conversion of the base case to chapter 7 on February 6, 1990, three trips to the district court to review reports and recommendations issued by this court, the substitution of James Boyd for Gerald Barefield as trustee, and the entire Bush administration.[14] Throughout this period the parties have engaged in pure, unmitigated, scorched-earth, take-no-prisoners, all out thermonuclear warfare.

### E. Equitable subordination generally.

Contained in a number of equitable subordination opinions is a statement along the lines of this paragraph found in *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 B.R. 139, 172 (Bankr. E.D.N.Y.1983):

> The remedy of equitable subordination must remain sufficiently flexible to deal with manifest injustice resulting from violation of the rules of fair play. *See Pepper v. Litton*, [308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)].... In the words of the Fifth Circuit in *Matter of Multiponics*, [622 F.2d 709, 5th Cir. 1980], "[w]here ingenuity spawns unprecedented vagaries of unfairness, [the bankruptcy courts] should not decline to

recognize their marks, nor hesitate to turn the twilight for [the offending claimant] into a new dawn for other creditors." 622 F.2d at 722.

The elusive character of this remedy is mirrored in the deference given the courts by Congress in fashioning a proper test for equitable subordination:

> [A]fter notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purpose of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The legislative intent of this provision was to allow the common law theory of equitable subordination to continue its development in the courts. H.REP. No. 595, 95th Cong., 1st Sess. 359 (1977); U.S.Code Cong. & Admin.News 1978, pp. 5787, 6315; *Badger*, 106 B.R. at 975.

Some headway has been made in formulating ground rules of universal application for deciding equitable subordination cases. At the most basic level a three pronged test has evolved which has seen widespread application:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

This test was distilled from previous case law in *In re Mobile Steel Co.*, 563 F.2d 692,

---

**13.** All previous counts as to the Bank have been dismissed except for (1) the preference count as to which a motion for summary judgment awaits hearing and decision and (2) the fraudulent conveyance/fraudulent transfer counts challenging the adequacy of consideration of the pre-petition release which AUSCO executed surrendering any claims it might have against the Bank. Since the release was as to counts either previously or now dismissed by this court, the latter counts are now moot.

**14.** The procedural history of this case (*sans* election coverage) is chronicled in exacting detail in this court's report and recommendation to the district court dated April 2, 1991.

700 (5th Cir.1977), and adopted most recently by the Sixth Circuit in *First National Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Serv., Inc.)*, 974 F.2d 712 (6th Cir.1992).

It is objectively easy to determine whether the plaintiff has satisfied the last two requirements of this test. But subjectivity persists in the first prong which requires "some type of inequitable conduct." Courts have hewn away at this element by dividing cases into two categories based on the relationship between plaintiff and defendant. Where there is a fiduciary relationship, a high standard of conduct is imposed:

> He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment.

*Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939) (footnotes omitted). Traditionally fiduciaries held to this standard are the usual variety of officers, directors, attorneys and the like. However, under certain circumstances a lender may also become subject to this duty.

■ A lender may become a fiduciary of the debtor and possibly the debtor's creditors if it uses its leverage to take over operation of the company and thus step into the shoes of the traditional corporate fiduciaries. A concise statement of the rationale behind this result appears in *Badger*, 106 B.R. at 977:

> If the lending institution usurps the power to make business decisions from the customer's board of directors and officers, then it must also undertake the fiduciary obligation that the officers and directors owe the corporation (and its creditors). This reasoning also dictates the scope of the term "control." What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by the officers and directors.

■ The standard of conduct is considerably lower for the arms' length creditor, however. Equitable subordination in such cases is "an extraordinary remedy." *Teltronics*, 29 B.R. at 168; *In re W.T. Grant Co.*, 4 B.R. 53, 74 (Bankr.S.D.N.Y.1980) (*Grant I*), aff'd, 20 B.R. 186 (S.D.N.Y. 1982), aff'd, 699 F.2d 599 (2d Cir.) (*Grant II*), cert. den., 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). The claim of a nonfiduciary creditor generally will not be equitably subordinated unless egregious conduct on behalf of the creditor can be proven with particularity. *Zimmerman v. Cent. Penn Nat. Bank (In re Ludwig Honold Mfg. Co., Inc.)*, 46 B.R. 125, 128 (Bankr.E.D.Pa.1985); *Teltronics*.[15] The Trustee has argued that Manufacturers is exposed to liability under either of these standards.

### 1. The fiduciary standard.

■ In the Trustee's predecessor's second amended complaint a count for breach of fiduciary duty was pled, a cause of action subsumed in the Trustee's claim for equitable subordination. The count for breach of fiduciary duty was ultimately dismissed by the district court's partial

---

**15.** Courts have at times phrased the query regarding the standard to be applied in terms of the "insider" status of the creditor. *See, e.g. Grant I*, 4 B.R. at 75; *Zimmerman*, 46 B.R. at 128. This usage is not entirely accurate. The distinction which the courts are attempting to embody is that which between fiduciaries and nonfiduciaries. The difficulty with using the term "insider" to capture this distinction is that "insider" is statutorily defined in 11 U.S.C. § 101(31) and includes parties who may not be fiduciaries of the debtor at common law. One example is the spouse of a director of a debtor corporation. Conversely, some fiduciaries, most notably attorneys, are not identified in § 101(31) and may not be within the statutory definition of "insider." We therefore focus not upon the question of whether the Bank was an insider, but instead whether it was a fiduciary.

adoption of this court's report and recommendation dated April 2, 1991. That report and recommendation summarized the relevant law as follows:

> The borrower-lender relationship is one of debtor-creditor, and the typical debtor-creditor relationship is not normally one including fiduciary duties. *Thigpen v. Locke*, 363 S.W.2d 247 (Tex.1962). *See Dennison [Denison] State Bank v. Madeira*, 230 Kan. 684 [640 P.2d 1235] (1982). As the Second Circuit observed in *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2nd Cir.1983), *cert. denied*, 464 U.S. 822 [104 S.Ct. 89, 78 L.Ed.2d 97] (1983), a bank would be remiss in its duty to its own creditors and shareholders if it did not monitor its borrowers' activities carefully. However, where excessive lender control or influence can be established, the lender may be placed in a fiduciary capacity. The fact that the lender is the principal, dominant lender, or that it offered advice or closely monitored the activities of the borrower is not sufficient to establish a fiduciary relationship.

> The Honorable Kenneth G. Owens in *In re American Lumber Company*, 7 B.R. 519, 529 (Bankr.D.Minn.1979) instructs that the line between debtor and lender is crossed where the lender exercises control over all or substantially all aspects of the finances and operations of the debtor. In *American Lumber*, the lender was intimately involved with and controlled the debtor's payment of payables and wages, collection and use of accounts receivable and contract rights, purchase and use of supplies and materials, inventory sales, salaries of the principals, the employment of employees, and receipt of payments for sales and accounts receivable. Under those conditions a special relationship existed which imposed upon the lender the responsibilities of a fiduciary.

April 2, 1991 Report and Recommendation at 36–37. In the context of the instant motion the Trustee has made numerous additional fact assertions which did not appear on the face of the second amended complaint, which may arguably cure the infirmity of the original breach of fiduciary duty count insofar as it relates to the equitable subordination count. But even if the dismissal of the claim for breach of fiduciary duty did not adjudge the facts now before the court, the legal conclusions reached are law of the case and resolve the Trustee's argument that a fiduciary duty could exist in the absence of lender control or direction of the debtor. Thus the fact that the Tiscornias and Gerber, experienced businessmen all, may have reposed trust in the Bank does not give rise to a fiduciary duty. The court will not address this issue further except to note that only where the debtor is so "easily dominated, old, or weak-minded," *Harris Trust & Savings Bank v. Keig (In re Prima)*, 98 F.2d 952, 965 (7th Cir.), *cert. den.*, 305 U.S. 658, 59 S.Ct. 357, 358, 83 L.Ed. 426 (1939), and reliance upon the lender for business making decisions is inevitable may a reposing of trust in the lender be a basis for a finding that there is a fiduciary duty owed. The Trustee has not asserted that the officers of AUSCO were easily dominated, old, or weak-minded, nor would such an assertion be supportable.[16]

"Control of a corporation can be established by either stock ownership or the actual exercise of direction, management or control." *In re Beverages International, Ltd.*, 50 B.R. 273, 282 (Bankr.D.Mass.1985). Control in the instance of stock ownership or other formal device[17] can be termed *"de jure"* while control in the instance of actual

---

**16.** All of the board members were seasoned businessmen. Gerber was hired by AUSCO in 1969 as assistant controller, and was promoted to controller and chief financial officer in 1976. He also became a director in 1976. Edward has a degree in Business Administration from Michigan State University. James also has a degree in Business Administration from Michigan State University and had served a director for a local bank. Lester, in addition to his many years of experience at the helm of AUSCO, was a director of People's State Bank for 40 years. Bank Brief at 10–13.

**17.** This might be the case, for example, where a voting trust or other mechanism is used to neutralize shareholder rights while the board of directors is under lender control.

exercise of managerial discretion can be described as *"de facto."*

A structural analysis of the debtor will suffice to determine whether *de jure* control by the lender exists. Under Michigan law, control of a corporation is generally divided among three groups of individuals: the shareholders, the board of directors, and the officers. The shareholders elect the board, and thus control its composition.[18] MICH.COMP.LAWS ANN. § 450.1402 (West 1988). The board appoints, and thus controls the officers, unless the articles of incorporation otherwise provide. MICH. COMP.LAWS ANN. § 450.1531(1) (West 1988). Gerber testified that, consistently with this statute, AUSCO's by-laws provided that its officers served at the pleasure of the board. *Supra* at 469. A creditor who controls the stock of the debtor will therefore control the other levels of the debtor as well. *In re Process–Manz Press, Inc.,* 236 F.Supp. 333 (N.D.Ill.1964), *rev'd on jurisdictional grounds,* 369 F.2d 513 (7th Cir.1966) is an example of a lender obtaining *de jure* control of the debtor. In that case the lender obtained control over 90% of the debtor's stock. Pursuant to an assignment of accounts receivable, the lender also collected accounts, parsing out to the debtor those funds necessary to meet payroll and other expenses. The court concluded that under these facts the lender was effectively the owner of the debtor and was thus subject to a fiduciary duty.

The record is utterly devoid of any evidence that Manufacturers attempted to gain control of the stock interests in the company or to in any other way mechanically control AUSCO. Thus the Bank did not have *de jure* control. In truth, *de jure* control rested in the hands of Lester. It is uncontested that at all times relevant to this case Lester held a majority of the voting stock and for a period was the only board member. Therefore, the Trustee

must establish a fact issue as to whether the Bank had *de facto* control in order for his fiduciary duty claim to survive summary judgment.

 Actual or *de facto* control does not exist simply because bargaining power was greatly skewed in favor of the lender. This will invariably be true wherever a debtor's primary lender is on the verge of terminating the debtor's operations:

> Through its loan agreement, every lender effectively exercises "control" over its borrower to some degree. A lender [who is the primary lender and whose loan is in default] will usually possess "control" in the sense that it can foreclose or drastically reduce the debtor's financing. The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender.

*Smith v. Associates Commercial Corp. (In re Clark Pipe & Supply Co., Inc.),* 893 F.2d 693, 701 (5th Cir.1990). *Clark Pipe* goes on to say that the mere possession by a lender of power over the borrower does not establish control; the lender must have used that control to direct the activities of the borrower. In *Zimmerman,* 46 B.R. at 128, the court stated that the control must be so overwhelming that there must be, "to some extent, a merger of identity." *Teltronics,* 29 B.R. at 170, describes the conduct required as "a domination of [the debtor's] will." In yet other words, the facts which the Trustee must produce must raise a genuine question whether the Bank controlled the day-to-day activities of AUSCO in the same manner that a director or officer would. *Unsecured Creditors'*

---

**18.** For this reason the fact that Bunker, a Bank officer, served on AUSCO's board is of no more than passing interest. Mr. Bunker may have represented the Bank's interests on the board, as the memorandum submitted by the Trustee establishes, but he did so at the pleasure of the Tiscornias, the stockholders of AUSCO. More-over, he was but one of several board members and thus could not even control that body. This evidence therefore does not establish *de jure* control, and there has been no evidence that he took part in day-to-day operation (*de facto* control) of AUSCO.

*Committee v. Banque Paribas (In re Heartland Chemicals, Inc.)*, 136 B.R. 503, 517–18 (Bankr.C.D.Ill.1992).

At least one bankruptcy court has stated that day-to-day control is not necessary in order for a creditor to be subjected to a fiduciary duty. In *Unsecured Creditors Committee v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 895 (Bankr.N.D.Ill.1991) the court stated as follows:

> The guiding principle is that the lender is liable as a fiduciary if it assumes the power of a fiduciary. Therefore, operating control does not necessarily mean day-to-day control, but may simply be control over the decisions that a corporate fiduciary is expected to make. Decisions concerning the termination and replacement of executives, the release of claims, and the filing of a bankruptcy petition are certainly issues which would be decided by fiduciaries. It is sufficient for purposes of a motion to dismiss for the committee to allege that Citicorp controlled these and other major decisions, and therefore claim that Citicorp became a fiduciary.

This court must respectfully disagree with this conclusion. It is only when the lender effectively steps into the shoes of current management that it is subjected to a fiduciary duty; the *Mobile Steel* test already provides for isolated incidents of misconduct or overreaching by a secured creditor. While the lender may not have to "micromanage" the debtor in order to cross this threshold, it must supplant current management in order to have control of the business. "What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by officers and directors." *Badger*, 106 B.R. at 977.

Actual day-to-day control is required because the debtor may parry any single thrust by filing bankruptcy. Courts denying equitable subordination claims have at times focused on the fact that the debtor had the power to file bankruptcy whenever it wished. *See Clark Pipe*, 893 F.2d at 702; *Prima*, 98 F.2d at 964. In *Alumi-*

*num Mills* the plaintiff alleged that the debtor's stock was itself collateral of the bank defendant. *Aluminum Mills*, 132 B.R. at 869. Thus, the bank was in a position to assert *de jure* control in that case and prevent the filing of bankruptcy.

Even where a creditor exercises day-to-day control over the debtor the debtor may still retain the power to file bankruptcy. But it is at this point that the power to file bankruptcy becomes an ineffective response. The exercise of day-to-day control entails the making of incremental decisions that have an impact only in the aggregate. The threat of bankruptcy in response to any one of these decisions by the creditor will seem inappropriate. But over time, the debtor's business posture will be an outcome of decisions made by the lender, not the debtor. The creditor having substituted its business judgment for the debtor's, it is appropriate that it should also shoulder the same fiduciary responsibility as did debtor's management.

There has been no allegation that at any time Manufacturers had the power to prevent AUSCO from filing bankruptcy; the record fully supports an affirmative finding that Manufacturers did not have this power. Therefore, in order to prevail the Trustee must allege facts showing that Manufacturers controlled the day-to-day operations of AUSCO.

The Trustee offers eight "facts," some based on direct evidence, others based on inferences drawn from circumstantial evidence, as proof that Manufacturers controlled AUSCO:

(1) The Bank participated in Ausco decision-making for a long time, and was intimately involved in key operational decisions, including closing the foundry and implementing the Consolidation Plan;

(2) The Bank made Ausco hire Sachs;

(3) The Bank would not let Ausco fire Sachs;

(4) Sachs admitted he reported to the Bank and that his decisions were made with Bank approval;

(5) Lester Tiscornia's testimony that the Bank "was calling the turns at Ausco;"

(6) The Bank installed a CEO pursuant to an understanding with the CEO that the CEO was to end Ausco's relationship with the Bank, then get whatever he could for himself;

(7) The Bank "incentified" Ausco's CEO (with Ausco's money) to retire Bank debt and thus to subordinate Ausco's interest to the Bank; and

(8) The Bank paid Sachs $300,000 he did not earn (with Ausco's money) over the objection of Ausco.[19]

Trustee's brief at 48–49 (citations omitted). Taken either individually or as a whole these allegations do not establish day-to-day control by the Bank.

The first allegation is that "The Bank participated in Ausco's decision-making for a long time, and was intimately involved in key operational decisions, including closing the foundry and implementing the Consolidation Plan." The direct facts offered by the Trustee to support this allegation establish that the Bank carefully monitored AUSCO's activities, and provided advice on occasion. Numerous courts have held that the existence of a long-standing bank/customer relationship in which the creditor receives financial reports and offers business advice is not of itself evidence of lender control. *See Clark Pipe,* 893 F.2d at 702; *Zimmerman,* 46 B.R. at 129; *Teltronics,* 29 B.R. at 172; *Burner v. Security State Bank (In re Burner),* 109 B.R. 216, 226–28 (Bankr.W.D.Tex.1989); *see also Huizar v. Bank of Robstown (In re Huizar),* 71 B.R. 826, 831–32 (Bankr. W.D.Tex.1987) (long-standing personal friendship and business relationship between bank officer and debtor did not render bank an insider for preference purposes). As the court stated in *Grant II,* 699 F.2d at 610–11:

> With respect to [the allegation that the bank claimants used their position of control over the debtor's management to prevent the debtor from promptly seeking bankruptcy relief], the Bankruptcy Judge was warranted in attaching little

importance to general statements by Grant officials that the banks were "running" Grant. There is no doubt that, at least from March of 1974, the banks kept careful watch on what was going on at Grant; they would have been derelict in their duty to their own creditors and stockholders if they had not. It is not uncommon in such situations for officers whose companies have been brought to the verge of disaster to think that they still have better answers than do the outsiders. *In order to establish their claims the appellants must show not simply that the banks proffered advice to Grant that was unpalatable to management, even advice gloved with an implicit threat that, unless it were taken, further loans would not be forthcoming.*

(Emphasis supplied).

There is a wealth of case law that supports the exchange of information and advice between debtor and creditor as a proper aspect of the relationship. Manufacturers made a substantial financial commitment to AUSCO. In absolute dollars its contribution to the company was far more significant than that of either James or Edward Tiscornia. As the *Grant II* court observed, the Bank had not only the right, but the duty to see that its collateral was preserved and protected. This of necessity required an ongoing dialogue with the company, especially after it started showing signs of distress.

The existence of such a dialogue has been established by the Trustee by direct evidence; but no proofs have been offered to show that the Bank was compelling AUSCO to accept its advice on a day-to-day basis. In the absence of testimony that the Bank constantly directed AUSCO's daily business decisions upon pain of calling its loan, the dialogue between the parties alone does not establish a merger of identities.

---

**19.** The court has yet to see a citation to any testimony that any objection was made to the Bank. James testified that he protested to Sachs. No testimony other than James' was offered by the Trustee on this score. Evidence that Sachs relayed James' complaint to the Bank is conspicuous by its absence. *See* transcript excerpts at 475, *supra.*

The second fact allegation, that AUSCO was forced to hire Sachs, cannot evidence Bank control of AUSCO. Stating the argument most favorably to AUSCO, this allegation can be taken to support the claim that the Bank controlled AUSCO in three different ways: a) the Bank controlled AUSCO in the act of forcing it to retain outside management; b) the Bank controlled AUSCO by selecting the outside manager to retain; and c) the Bank's act of selecting the specific outside manager which AUSCO was to retain was taken for the purposes of establishing a foothold in AUSCO's management through which AUSCO could be controlled by the Bank. All of these arguments are fatally flawed.

The requirement that replacement management be hired, (a), has long been established as a legitimate condition of forbearance the exercise of which will not subject a lender to a fiduciary duty. The argument that a lender does not have this right was raised in *Prima* in 1938 with little success:

> Even in the absence of the bankruptcy enactment, and conceding that the debtor had reasonable grounds for its belief, and further conceding without admitting that the banks threatened to do what the debtor believed would be done in case it refused to sign the contract, yet, under the decisions, we think the debtor was not subject to undue influence. Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful. [Citation omitted.]

*Id.* at 964–65. A similar conclusion was reached by the court in *Badger*.

Manufacturers was clearly within its rights to require that the Tiscornias be replaced with outside management. We therefore turn to (b), the second variation on the Trustee's theme, that the Bank controlled AUSCO by selecting the outside manager. The allegation that the Bank would not permit AUSCO to choose any outside manager except Sachs is one for which there has been no direct support; it is instead a conclusion which the court is asked to draw from circumstantial evidence. The court may therefore consider the plausibility of the connection between the circumstantial facts and the fact conclusion.

The court easily can find this connection implausible. Contrary to the Trustee's assertion, there is direct evidence that AUSCO had a number of alternatives to hiring Sachs that it considered and rejected in August 1986. The most obvious is that AUSCO could have filed bankruptcy, as discussed *supra* at 481, when it was told to hire outside management, had that option been so unpalatable.

AUSCO also could have hired Fountain. The Trustee relies upon James' testimony to argue that Fountain was not a viable candidate due to his requirement that he have a controlling equity in the company, and that this was known to the Bank at the time he was offered to AUSCO.[20] The unstated implication which must be drawn in order for this fact to have any relevance is that the Fountain suggestion was a sham to make a military coup look like a democratic election.

This implication is not a reasonable reading of the facts presented by the parties.

---

**20.** The assertion that AUSCO could not hire Fountain is in fact inconsistent with the Trustee's theory that the Bank controlled AUSCO. The only reason Fountain was unacceptable, according to the Trustee, is because he required a controlling interest in the company. Yet this very fact, that surrender of control was unacceptable to AUSCO, forms the cornerstone for the Trustee's theory that the Tiscornias turned control over to the Bank. This leaves the Trustee's argument that AUSCO had to hire Sachs on the horns of a dilemma. If Fountain was not truly unacceptable, then the Bank had offered more than one management candidate, which undermines the argument that the Bank forced AUSCO to hire Sachs so that it could use him as its "shill" to control the company. On the other hand, if Fountain was unacceptable based solely upon his equity requirement, then what was really unacceptable to AUSCO was the concept of surrendering control to anyone, which would include the Bank.

The only reason offered to support the Trustee's position that Fountain was not an alternative is Fountain's desire to hold a controlling interest in the business if he came on board. However, AUSCO proceeded to interview Fountain after it learned of his "unacceptable" equity requirement. AUSCO even contacted Fountain later, when Sachs' second contract was being negotiated, to find out whether he was still available. Despite the fact that giving Fountain an equity position was unacceptable, AUSCO later offered Stuebe, Sachs' successor, a substantial equity interest in the company. These are direct, undisputed facts that contradict the inferred conclusion that Fountain was unacceptable.

It is certainly true that giving up a controlling interest in the business would have been an unattractive possibility to the Tiscornias. Embree acknowledged this in his statement to James. However, depending on the relative skill of the candidates, the Tiscornias may have been willing to make this sacrifice. It is almost certainly more valuable to own a 49% interest in a viable corporation than to hold a 100% interest in the same company in chapter 7. In view of all the facts, Embree's statements about Fountain cannot plausibly be interpreted as evidence of some intentional scheme by the Bank to compel AUSCO to hire Sachs.[21]

Finally, AUSCO could have hired any other individual acceptable to the Bank. In order to complete his argument that AUSCO had no choice but to hire Sachs the Trustee argues that AUSCO could not choose a turnaround expert not on the Bank's list of two. Again the Trustee turns to the testimony of James for support. James testified that Embree told him that he was restricted by the Bank to considering Sachs and Fountain "[t]o the extent those were the only two names that he gave me." James Tiscornia dep., Vol. VIII at 819. He also testified that he did not ask AUSCO's attorneys or accountants to

suggest an alternative. The reason given for this was that he "trusted the bank." James Tiscornia dep., Vol. VIII, p. 822. James' statement that he did not attempt to find another candidate does not logically support the conclusion that the Bank would not deem any other candidate sponsored by AUSCO "acceptable," regardless of his or her qualifications. In the absence of an admission by the Bank that it would have rejected any candidate located through AUSCO's own efforts, what the Bank would have done under these circumstances is sheer speculation and cannot be blithely assumed as the Trustee would have us do. Taken as a whole, the record provides no factual support for the Trustee's assertion that the Bank would not permit AUSCO to hire anyone but Sachs.

The third variation on the Trustee's argument that AUSCO had to hire Sachs is that the Bank's act of selecting the specific outside manager which AUSCO was to retain was taken for the purposes of establishing a foothold in AUSCO's management through which AUSCO could be controlled by the Bank. This can easily be rejected because it was premised upon the assumption which AUSCO had no alternatives to Sachs, which is an unsupported conclusion.

Up until the time that Sachs was hired, there is no question that AUSCO "was calling the turns," in Lester's words; the only facts offered by the Trustee to support a contrary conclusion, the close relationship between the Bank and AUSCO, and the negotiations surrounding Sachs' hiring, have previously been rejected. In order to put the Bank in the position of a director or officer AUSCO must therefore prove a chain of command from the Bank to Sachs to AUSCO. Manufacturers has offered credible evidence to establish that Sachs did not control AUSCO, attacking the second link in this chain. However, to shorten an already lengthy opinion the court will simply assume that the day

21. If it truly wanted to control the debtor, one wonders why the Bank would offer Fountain to channel the debtor to Sachs when offering only Fountain and rejecting all others would have been a much more direct route to terminating the Tiscornia's control of the company. Once

Fountain was hired and had his controlling equity, the Tiscornias would have had no way to oust him if they decided that his hiring was a mistake. By contrast, the Tiscornias retained this power as to Sachs, and ultimately exercised it.

Sachs walked in AUSCO's door he controlled AUSCO's day-to-day decision-making. The crux of the matter thus comes down to establishing a genuine issue of fact as to a controlling link between the Bank and Sachs, and the relevant time frame starts with September 15, 1986, the day Sachs was hired.

The *Badger* opinion addressed what must be shown to establish that a lender exercised control through an outside manager. *Badger* also involved a debtor which was required to take on outside management. The court succinctly summarized the facts argued by the debtor in that case to support a finding of fiduciary status:

(1) Thometz and Slykas [the outside managers] were hired on Continental's [the lender's] recommendation; (2) Thometz was a former employee of Continental and Slykas had a "close relationship" with a Continental employee; (3) Badger's [the debtor's] sole shareholder turned over management to Thometz and Slykas on Continental's recommendation; (4) Slykas, "who purported to be acting on behalf of Badger," agreed to the restructuring which did not provide any additional funds to Badger, but benefited only Continental vis-a-vis other creditors; and (5) Slykas failed to make payroll payments to the IRS and Continental had actual and imputed knowledge of this.

*Id.* at 978. The court found that no control by the creditor over these two insiders had been established:

A necessary link in Badger's apparent theory is that Continental had some arrangement with Slykas and Thometz under which Continental effectively managed Badger. Badger, however, alleges only the conclusion that these two "acted in concert with Continental ... to assume control over Badger." *There is nothing alleged that indicates how the purported relationship between Badger's two officers and Continental was formed, the terms of the purported arrangement, the circumstances that mo-*

*tivated Thometz and Slykas to serve in such capacity, any details as to what they did, or how Continental controlled what they did.*

Without factual allegations showing the existence of an arrangement to control Badger, it is clear that Continental's recommendation of these two men and their subsequent management of Badger does not by itself establish control and dominion.

*Id.* (emphasis supplied). The Trustee's protestations to the contrary, this language from *Badger* is precisely on point. The Trustee must raise sufficient, particular fact issues as to the existence of such an arrangement between Sachs and the Bank in order to survive summary judgment.

The third fact asserted by the Trustee to establish that the Bank was AUSCO's fiduciary is that "The Bank would not let Ausco fire Sachs." On October 28, 1987, Day told Lester that he had the power to fire Sachs. Lester, patriarch and chairman of the board, admitted that from this point forward he knew he controlled AUSCO. The only evidence offered to show that the Bank would not have permitted AUSCO to fire Sachs are statements by James that he believed he could not question Sachs and therefore did not ask the Bank whether AUSCO could replace Sachs with another manager. For purposes of considering whether the Bank may have been a fiduciary only, it will be assumed that the Bank would have called the loan if Sachs were fired,[22] and that this remained true until October 28, 1987.

Making this assumption does not equate to Bank control of AUSCO, however. The right to require outside management as a condition of forbearance would be meaningless if the debtor had the power to promptly fire the outside manager and go back to business as usual. If a specific arrangement as described in *Badger* existed, the fact that AUSCO could not fire Sachs would have some significance to prove that the Bank had cut off one possible means of

---

**22.** The court addresses the validity of this assumption in the context of the Bank's liability as a non-fiduciary, *infra* at 488.

escape. But standing alone this fact neither establishes nor disproves lender control.

Based on factual assertions one, two and three, the issue can be further narrowed: has the Trustee raised a genuine issue of material fact as to whether the Bank controlled Sachs from September 15, 1986 to October 28, 1987? It is clear that the Trustee has not.

The fourth and fifth assertions, that "Sachs admitted he reported to the Bank and that his decisions were made with Bank approval," and the reference to "Lester Tiscornia's testimony that the Bank 'was calling the turns at Ausco,'" both rest entirely on three pages of testimony taken from Lester's deposition. Given that nearly 10,000 pages of deposition testimony have been filed with the court among the 600 plus docket entries, and that hundreds if not thousands of additional pages of deposition testimony doubtlessly have been produced in this case which remain unfiled, this significant three page passage bears repeating:

Q: [By Richard A. Kay] Did you assume that Ben Sachs was operating with the bank directing him and telling him how to run the business?

A: I can't speculate on that. I—

Q: Well, I'm asking you—you've got it in black and white. You said [in personal notes] you assumed. You assumed he was operating. Do you mean Ben Sachs?

A: I assumed he was reporting to the bank.

Q: You assumed Ben Sachs was reporting to the bank?

A: He was running the company with the approval of the bank.

Q: You assumed that the bank was, you said here, calling the turns?

A: That's what I said.

Q: You assumed that the bank was directing how the company should be run?

A: Through Mr. Sachs.

Q: You assumed that the bank was operating this company, Ausco, by telling Mr. Sachs what to do?

A: They were approving Mr. Sachs' decisions.

Q: *Were they telling him what to do? Did you think that?*

A: *I can't answer that question.*

Q: Did you assume that Mr. Sachs was following orders of the bank in his operation as the manager of Ausco?

A: Well, to the extent that Ben Sachs was C.E.O. and running the company with the approval of the bank.

Q: Your notes say that Ben Sachs was operating under the direction of the bank.

A: Well—

Q: Is that what you thought, or rather is that what you assumed?

A: I would say that's what I assumed. I—

Q: Okay. And when you say that the bank was calling the turns, you assumed that the bank was telling Mr. Sachs how this business should be run?

A: I think I can answer that by saying that Mr. Sachs told me that he was reporting to the bank, and his decisions were made with the bank's approval.

Lester Tiscornia dep., vol. I at 154–156 (emphasis supplied). Although not cited by the Trustee, without missing a beat, this line of questioning continues as follows:

Q: What did you mean when you said here that Manufacturers Bank was calling the turns?

A: Well, I think I've answered that.

Q: Okay. Did you see anything wrong with the bank being aware of the decisions that were involved in operating this business?

A: No.

Q: Did you see anything wrong with the bank approving of the decisions that were made in operating this business?

A: No.

*Id.* at 156–57. Based upon this testimony it is clear that the allegation that the Bank

was "calling the turns" at AUSCO was nothing more than an assumption on Lester's part. While the fact that Lester made this assumption is direct evidence, the conclusion that the Bank was actually making decisions for AUSCO is not. To the contrary, Lester specifically stated that he had no way of knowing whether the Bank was directing Sachs' decisions, as the emphasized language *supra* at 486 unambiguously establishes. Whatever connotations the Trustee may attempt to attach to the phrase "calling the turns," the witness whose phrase it was explained what it meant: Sachs reporting *his* decisions to the Bank, and the Bank approving those decisions.

The statement attributed to Sachs by Lester that he reported to the Bank and that the Bank approved his decisions does not prove the existence of a control arrangement. Under these assumptions, the Trustee has established only that the Bank monitored operations and proffered advice. But even had the Bank done this and further backed up its advice with a threat to withhold credit (a fact which cannot be assumed based upon this record), the Trustee would not yet have proofs sufficient to conclude that the Bank controlled AUSCO. *Beverages*, 50 B.R. at 282. As already discussed *supra* at 482, a creditor has every right to monitor the status of its collateral and see that it is preserved. We see no reason to strip a creditor of that right merely because debtor's management has been replaced by an outside manager. *Badger* requires the Trustee to establish the means by which the Bank exercised *day-to-day control* of AUSCO's business. The most the testimony shows is that Sachs made the decisions and that the Bank *approved* them in the manner of a lender monitoring its collateral.[23] This does not equate to a showing that the *Bank* made the decisions and that Sachs *implemented* them. Certainly this fact does not support an inference that the

Bank was controlling Sachs. The testimony cited by the Trustee does not establish the requisite fact issue.

The sixth allegation, "The Bank installed a CEO pursuant to an understanding with the CEO that the CEO was to end Ausco's relationship with the Bank, then get whatever he could for himself" also fails to establish a mechanism of control as required by *Badger*. Assuming, as we must, that Sachs made this statement, does not explain how Sachs became the Bank's instrumentality. The statement does explain what the Bank's goals in the relationship were: to be repaid. But how was the Bank to force Sachs to follow its instructions once he was employed by AUSCO and became its fiduciary? What would motivate Sachs to favor the Bank's interests over those of the company that employed him? What acts did Sachs take in furtherance of this specific agreement in breach of his fiduciary duties to AUSCO? These are questions that are posed in *Badger* which are not answered by this allegation.

The seventh allegation is that "The Bank 'incentified' Ausco's CEO (with Ausco's money) to retire Bank debt and thus to subordinate Ausco's interest to the Bank." The Bank's use of the term "incentification" has been triumphantly held aloft by the Trustee as the mechanism which distinguishes this case from *Badger*. In fact, the court views the "incentification" transaction as less actionable than the transaction referred to in *Badger* in which one of the outside managers agreed to a restructuring which did not provide any additional funds to Badger, but benefitted only the secured creditor *vis-a-vis* other creditors. *Badger*, 106 B.R. at 978. In the present case there was no evidence that the Bank did improve its position at all, and AUSCO got a benefit in that it was able to continue with Sachs as its president and CEO.[24]

---

**23.** Even Lester approved of the Bank's conduct, as he admitted that he saw nothing wrong with what the Bank was doing. This is not surprising since the practice was a longstanding one dating back to the days when Lester was at the helm.

**24.** The court is aware that the Trustee questions the value of Sachs' services to AUSCO. This is the topic of a separate opinion regarding Sachs' motion for summary judgment.

The eighth assertion, that "The Bank paid Sachs $300,000 he did not earn (with Ausco's money) over the objection of Ausco," is irrelevant to the inquiry of whether the Bank controlled Sachs and was therefore subject to a fiduciary duty because the negotiations and payment of the bonus occurred in February of 1988, months after the company knew it could fire Sachs if it so wished.[25]

The Trustee fairs no better viewing these eight allegations as a whole than it does taking them individually. The Trustee gave examples of the Bank's involvement in major decisions that would affect the extent of its debt or the value of its collateral. But in not one instance has the Trustee shown that the Bank controlled the day-to-day decision making of AUSCO, either directly or through Sachs.

Having determined that there is no genuine issue of material fact as to whether the Bank was AUSCO's fiduciary, we now address the Bank's liability as a non-fiduciary.

### 2. The non-fiduciary standard.

■ Courts have described the standard of conduct to which a non-fiduciary will be held in the vernacular as the "morals of the marketplace." *See, e.g. Sleepy Valley, Inc. v. Leisure Valley, Inc. (In re Sleepy Valley, Inc.),* 93 B.R. 925, 933 (Bankr.W.D.Tex.1988); *Zimmerman,* 46 B.R. at 129; *Teltronics,* 29 B.R. at 171. The Trustee in the conclusion of his brief states, "The Bank argues that these acts do not depart from 'the morals of the marketplace.' This cynical view, obviously, postulates an entirely immoral marketplace." Trustee's Brief at 55. The Trustee appears to have missed the point.

Although not directly applicable in this case, the phrase *caveat emptor* best captures the moral standard to which parties in the market are held. Conduct forbidden of the fiduciary is expected in the marketplace: sharp dealing and hard bargaining,

with each player responsible for protecting its own self-interest. The creditor's actions in *Sleepy Valley* provide a measure of the quality of the morals of the marketplace. In that case the creditor held a judgment against the debtor. The parties were involved in settlement negotiations pre-petition but post-judgment, during the course of which the debtor provided financial data to the creditor identifying bank accounts and real estate holdings. The creditor "made good use of its new-found information," *id.* at 926, by liening the real property and garnishing the bank accounts. The debtor promptly returned fire by filing chapter 11. The debtor then commenced an adversary proceeding against the creditor seeking recovery of preferences and equitable subordination.

The case went to trial. Citing *Teltronics,* the court determined that the creditor had not offended the morals of the marketplace, and therefore ruled against the debtor: "Leisure Valley [the creditor] engaged in what may be considered hard ball tactics, but the court cannot find that their actions were anything more than the due diligence of a creditor attempting to secure performance of the debtor's obligation." *Id.* at 933. The creditor had no "moral" duty to protect the debtor from itself.

Making reference to "morals of the marketplace" is another way of stating the *Teltronics,* 29 B.R. at 169, requirement; to equitably subordinate a non-fiduciary's claim "egregious conduct must be proven with particularity." This standard has been even more tightly defined in this oft-cited passage from *Grant I,* 4 B.R. at 75:

> In order to equitably subordinate the claims of non-insiders, a greater burden must be sustained. It must be established that the holder of the claim to be subordinated *committed fraud, over-reaching or spoliation to the detriment of others.* A mere statement that the creditor is guilty of "inequitable conduct" will not suffice.

---

**25.** It must be pointed out that James premised his explanation as to why AUSCO agreed to pay the bonus upon his trust in the Bank. While that trust is irrelevant to the existence of a fiduciary duty at this point in time for the reasons stated above, the court will revisit the events surrounding the payment of the bonus in the context of the Bank's duty as a non-fiduciary, where this argument properly belongs.

(Emphasis supplied). A court applying this standard has held that the conduct must shock the conscience of the court in order to even survive summary judgment. *Stratton,* 104 B.R. at 730.

The Trustee argues that the eight points previously visited [26] establish egregious misconduct on the part of the Bank, and raises the following additional allegations (some of which are paraphrased from the Trustee's brief by the court):

(9) "James Tiscornia and Loren Gerber were told in no uncertain terms they would be fired if the Bank perceived they were not support [sic] Sachs" (Trustee's Brief at 51);

(10) The Bank concealed Sachs' known failures at Standard Tube (*id.* at 52); and

(11) The Bank decided to keep AUSCO afloat until its debt was retired "in order to avoid another lien's (the PBGC's) attachment" (*id.*).

Of the eight allegations used to support the Trustee's claim that the Bank was AUSCO's fiduciary, (1), (2), (4) and (5) have already been adequately addressed.

There is only one argument which the court finds troubling in this case, and it is a hybrid of the argument that the AUSCO could not fire Sachs, allegation (3) above, and the argument that the Bank "incentified" Sachs with AUSCO's money, allegation (7) above: that if AUSCO could not fire Sachs, its ability to negotiate with Sachs on the bonus issue would have been impaired, and thus the bonus would have been the product of overreaching by the Bank. There is no direct evidence on this issue; this is a conclusion that the Trustee draws from circumstantial evidence. The court finds this conclusion flawed for two reasons.

The first flaw is in the argument's premise, that AUSCO could not fire Sachs. AUSCO could fire Sachs; AUSCO did fire Sachs. In order for this premise to have any meaning, it must be restated: *"the Bank prevented AUSCO from firing Sachs in the period during which Sachs' contract was being renegotiated."* The two

italicized elements of this formulation do not appear in the Trustee's version, but they are clearly necessary to his argument. The fact that AUSCO could not fire Sachs cannot serve as a basis for subordination if it was not the Bank's conduct that prevented AUSCO from firing Sachs. By the same token, if the Bank had the power to require outside management, it had to have the power to require that that management be retained. Thus the prohibition against firing Sachs can only be significant if as a consequence of that prohibition the Bank was able to accomplish some egregious act against AUSCO, in this case forcing AUSCO to pay Sachs' bonus. Although for purposes of determining whether the Bank was AUSCO's fiduciary the court assumed that the Bank prohibited AUSCO from firing Sachs in the period between September 15, 1986 and October 28, 1987, in fact there is no more than a scintilla of support for this allegation on the record.

The best that the Trustee has offered to show that the Bank prohibited AUSCO from firing Sachs are statements by James to the effect that it was his understanding that if he complained about Sachs to the Bank that he (James) would be fired, hearsay statements repeated by Gerber that it was the Tiscornias' understanding that they could not fire Sachs, statements by Gerber that he believed in November 1987 (after the Bank directly told Lester he was in control) that the Bank would not let AUSCO fire Sachs, and Lester's statement that "it was almost imperative that [AUSCO] retain Mr. Sachs," quoted *supra* at 470.

Standing alone these statements may be circumstantial evidence to support the conclusion the Trustee reaches, that the Bank in fact forbade AUSCO to fire Sachs. However, these statements do not stand alone. Rose, who represented AUSCO, not the Bank, testified directly that the Bank "was very, very positive" in saying that AUSCO had to have outside management, but that it did not have to be Sachs. This testimony is not in conflict with the direct

---

**26.** *Supra* at 481.

fact that James and Gerber may have held the belief that the Bank would not allow AUSCO to fire Sachs. But of the two, only Gerber was asked what the source of this belief was, and he admitted that he had no basis for asserting that this belief was based upon a statement attributable to the Bank. Indeed, he testified that at this point in time he thought that AUSCO was required by the PBGC, not the Bank, to maintain Sachs as its manager.

The strongest statement offered by the Trustee to support his position is Lester's. However, the general statement that it was almost imperative that Sachs be retained must be measured in the context of the issue that the Trustee is attempting to raise, that the Bank prevented AUSCO from firing Sachs at the time that the second contract with Sachs was being negotiated. Lester testified directly on this issue:

A: We said to Mr. Embree [in the March 9, 1987 meeting], is the bank going to insist that we have to live with this horrendous contract? And we asked him if he wanted to see the contract, and he said no. And then we said, what would happen if we did not renew his contract? And he said that the bank would probably not go along—or would not go along with a replacement.

Q: With what?

A: With a replacement. In other words, if Ben Sachs' contract was not renewed, that we would have to have the approval of the bank for a replacement. In other words, if we didn't renew the contract, the bank would not continue to support us financially.

Q: Unless you—

A: In other words, the loan.

Q: Unless you got a replacement acceptable to the bank?

A: Somebody that the bank—right.

Q: That's correct?

A: That's correct.

Lester Tiscornia dep., Vol. I at 166. Whatever general impressions Lester may have had, Lester understood that, *in this specific context*, AUSCO could only refuse to renew Sachs' contract if it hired a replacement for Sachs acceptable to the Bank. *But it* could *refuse to renew Sachs' contract.* This statement in completely in harmony with the direct evidence of Rose's testimony. Lester's testimony is also consistent with AUSCO's conduct at the time in interviewing other candidates.

Although the Trustee has made much of AUSCO's "assumptions," "implications" and "beliefs," there is no question that AUSCO never tested its assumptions by asking the Bank critical questions at critical times. AUSCO may have made these assumptions and may have acted upon them. But the fact that assumptions were made is not at all proof that the assumptions were accurate. Based upon Lester and Rose's direct statements and their harmony with all of the other evidence, the court finds the circumstantial conclusion that the Bank prevented AUSCO from firing Sachs in the period during which Sachs' contract was being renegotiated highly implausible.

The second flaw is in the casual connection between the premise, that the Bank prevented AUSCO from firing Sachs, and the conclusion that the trustee draws, that "the Bank 'incentified' Ausco's CEO (with Ausco's money) to retire Bank debt and thus to subordinate Ausco's interest to the Bank." The thrust of this argument is to shift responsibility for agreeing to what the Trustee views as an exorbitant bonus from AUSCO's directors to the Bank. If the Bank used its leverage to force AUSCO to make a transfer to a third party who was not entitled to that transfer, the Bank would have overreached its position. However, numerous facts contradict the Trustee's unsupported conclusion that the Bank did use its power to require outside management to force AUSCO to agree to this bonus:

1) The Bank first learned of the Sachs bonus in a meeting held on March 9, 1987 openly between the Bank, AUSCO and Sachs;

2) AUSCO involved the Bank in the bonus issue to request a loan for an amount to which AUSCO had already

agreed to pay, subject to the contingency of financing—by the time AUSCO came to the Bank the $500,000.00 figure was therefore *fait accompli* without any input from the Bank;

3) At the time that the bonus was requested AUSCO had no major complaints about Sachs—only about the bonus itself;

4) Although AUSCO did indicate a reluctance to pay the bonus, it did so in the context of asking the Bank whether in its experience a demand such as Sachs' was reasonable;

5) No testimony discrediting the Bank's response that the demand was reasonable has been offered by the Trustee;

6) The Trustee has offered no evidence that in their March 9, 1987 meeting either Lester or Edward directly asked Embree to deny the loan request they had just made;

7) Neither Lester nor Edward asked Embree directly in the March 9, 1987 meeting if they could refuse to renew Sachs and pursue some other outside manager, nor did the Trustee produce evidence of this question being raised by AUSCO at any other time with the Bank;

8) AUSCO actually considered the possibility of retaining a different person to replace Sachs and even interviewed some candidates;

9) The negotiations between the Bank, AUSCO and Sachs subsequent to the March 9, 1987 meeting were at arms' length; and

10) Once the Bank was involved in the negotiations, it was actually more successful in defending AUSCO and the Bank's common interest on this issue than AUSCO had been, causing Sachs to defer most of the bonus and subject the remainder to forfeiture if certain benchmarks were not met before the letter of credit expired.

These uncontradicted facts establish that the negotiation of the bonus terms was at arms' length as to all parties, including AUSCO. The Trustee has offered no evidence that *anyone* forced AUSCO to agree to anything.

The Trustee characterizes the incentification memo as a method of subordinating AUSCO's interests to those of the Bank. In truth, however, this was always beyond the Bank's power to accomplish, at least without AUSCO's help, even given the disparate bargaining power the parties had. Each of the parties had a different interest to protect, and a different responsibility. Sachs' obvious interest was to get the most compensation for himself that he could. Gerber and the Tiscornias' interest as directors was to pay as little to Sachs as possible, and to continue AUSCO's credit with the Bank; they were AUSCO's fiduciaries. The Bank's interest was to get out of its lending relationship with AUSCO cleanly and as soon as possible;[27] its responsibility in this relationship was always to its stockholders, its creditors, and not to AUSCO. The only power the Trustee has shown that Manufacturers ever had over AUSCO was the power to say that no longer would it vouchsafe AUSCO's use of the Bank's money without any contractual right to do so. The Bank was not "a trusted financial advisor" to AUSCO any more than it was a charitable institution to fund AUSCO's unprofitable operations. The responsibility for protecting AUSCO's interests rested on the shoulders of Gerber and Tiscornias—the same men who brought the company to and over the brink of financial ruin. The hiring of Sachs never relieved them of this responsibility, although once hired he shared in it. The Tiscornias held the stock; they and Gerber controlled the board. As fiduciaries *they* were committed to act in AUSCO's best interests, even to their own personal detriment. If that duty required the filing of bankruptcy to defend against Sachs' bonus which in their judgment was unreasonable

---

**27.** The Bank plainly failed to achieve this objective. However, it must be noted that this goal is directly in conflict with AUSCO's goal, to extend its credit as far as possible so as to maintain operations. This is the classic conflict of interest between creditor and debtor and is the root of the rule that a creditor be considered a fiduciary of the debtor only under the most extreme of circumstances. It is also this conflict, among many others, which highlights the importance of corporate fiduciaries properly discharging their responsibilities.

but non-negotiable, then they were obligated to take that step even if it meant that they might ultimately lose their equity. Because they held that duty securely in their own hands, it was they alone who could agree to the subordination of AUSCO's interests, and as a matter of causation, only Gerber and the Tiscornias' breach of their fiduciary duties could lead AUSCO to subordinate its interests to the Bank in an arms' length transaction. The only other possibility, also fatal to the Trustee's argument, is that this agreement was in AUSCO's best interests. In either case, there has been no overreaching by the Bank.

The court does not find the remaining allegations, (6), (8), (9), (10), and (11) to raise a genuine issue of material fact.

Allegation (6): "The Bank installed a CEO pursuant to an understanding with the CEO that the CEO was to end Ausco's relationship with the Bank, then get whatever he could for himself." The statement attributed to the Bank may be somewhat unvarnished, but it does not signal an overreaching by the Bank. The court in *Clark*, considered unactionable far more inflammatory language than that used in this case. There the lender, Associates, limited advances on the debtor's line of credit so as to provide just enough funding to the debtor to pay down Associates' debt to the exclusion of other creditors without closing operations. Associates' former loan officer frankly testified that his goal was " 'to get the best position I can prior to the bankruptcy, i.e. I want to get the absolute amount of dollars as low as I can by hook or crook.' " *Id.* at 700. The trustee sought and obtained equitable subordination of Associates' claim which was affirmed by the district court and the 5th Circuit. On reconsideration, however, the appellate court reversed itself:

> In our original opinion, we failed to focus sufficiently on the loan agreement, which gave Associates the right to conduct its affairs with Clark in the manner in which it did. In addition, we think that in our previous opinion we were overly influenced by the negative and inculpatory tone of [the loan officer's] testimony.

Given the agreement he was working under, his testimony was hardly more than fanfaronading about the power that the agreement afforded him over the financial affairs of Clark. Although his talk was crass ... our careful examination of the record does not reveal any conduct on his part that was inconsistent with the loan agreement, irrespective of what his personal motive may have been.

*Id.* at 700–01. The best that the Bank's alleged statement can prove is that it could not care less what happened to AUSCO once its loan was repaid. This is hardly surprising given AUSCO's payment history. But the statement "does not reveal any conduct on the [bank's] part that was inconsistent with the loan agreement." It had every right to desire repayment, which was long overdue.

Allegation (8): "The Bank paid Sachs $300,000 he did not earn (with Ausco's money) over the objection of Ausco." The court has yet to see a citation to testimony that any objection regarding the modification of the letter of credit was made to the Bank. James testified that he protested to Sachs, but never said that Sachs relayed that complaint to the Bank. No testimony other than James' was offered by the Trustee on this score. *See* transcript excerpts at 474–75, *supra.*

The most favorable testimony regarding this episode is that the Bank would not have been willing to continue as AUSCO's lender in bankruptcy if Sachs was not paid on the letter of credit. This fact is based upon the testimony of James who in turn assigns a statement to this effect to Sachs. *Supra* at 475–76. Assuming that this was the true state of affairs, it amounts to nothing more than the Bank refusing to continue AUSCO's credit, something it clearly had the legal right to do. *Prima,* 98 F.2d at 964–65; *Grant II,* 699 F.2d at 610–11.

Allegation (9): "James Tiscornia and Loren Gerber were told in no uncertain terms they would be fired if the Bank perceived they were not support [sic] Sachs." The court found this statement at page 482 of

the Trustee's brief, unaccompanied by citation to any transcript. The request that current management cooperate with an outside manager is a necessary corollary to the right to require outside management. For this allegation to have any significance, the Trustee must couple this threat with some overreaching demand by the Bank. The Trustee never gets this far because the record does not even support his assertion that the threat was made. The court has found one passage in the Trustee's brief that addresses the threat of James' discharge, and that passage is set forth in its entirety *supra* at 468-69. In this excerpt James stated that his "perspective" of his position was that he had been instructed to follow Sachs' instructions, and that if he did not he was to be fired; James stated that based upon this belief he did not complain to the Bank when he became dissatisfied with Sachs. This testimony can be broken into two parts; the first, James' belief, and the second, statements from the Bank upon which that belief was based. The only statement James attributed to the Bank was that it instructed him that he was to cooperate with Sachs. The conclusion that he would be fired if he expressed his dissatisfaction with Sachs to the Bank he admits was his assumption.

The Trustee cited even weaker testimony from Gerber who merely stated that Day had implied that "some people" would be let go if Sachs were terminated. However, he admitted that Day never directly made this statement:

Q: [By Richard Kay] When Day told you there were going to be changes made, did he elaborate in any way?

A: The implication was that there would be some people left [sic] go.

Q: Did he say that?

A: No, but it was pretty definitive or pretty well—you know, there was not any misinterpreting his statement, really, what he meant by that.

Q: Was Sachs there when he made that statement?

A: No.

Q: He just said, there will be some changes made?

A: Yeah, and the tone and the attitude that he indicated it, indicated that, you know, there would be some—*at least my interpretation of what he meant was that there would be some people terminated or whatever had to be done.*

Q: But he never said—

A: But that Sachs was going to be in control.

Q: But Day never said any of those things?

A: No.

Gerber dep., Vol. XIII at 1923-24 (emphasis supplied). It seems a bit of a reach to characterize this testimony as stating *anything* in "no uncertain terms," to use the Trustee's words.

Beyond the Trustee's leap of interpretation is the fundamental fact which still remains: the only power Manufacturers had over Gerber, James, or anyone else at AUSCO was the power to say that it would not continue AUSCO's credit. If as a term of its forbearance it wanted outside management, it had a right to ask for that management. If AUSCO at any point chose to rescind its side of the deal by firing the outside manager or to eviscerate the agreement by refusing to cooperate with the outside manager, the Bank certainly had the right to treat that conduct as a breach of its forbearance agreement. Statements by the Bank to such an effect do not shock the conscience of the court and certainly do not arise to the level of egregious conduct.

Allegation (10): The Bank concealed Sachs' known failures at Standard Tube. There are two flaws in this argument; first is that there is no evidence that the Bank *concealed* anything about Sachs. Gerber testified that the Bank stated that as far as it was concerned Sachs had done a satisfactory job at Standard Tube; this had to have been true since Manufacturers was paid in full. There was no evidence that the Bank in any way attempted to prevent AUSCO from investigating Sachs' record at Standard Tube further.

The second problem with this argument is that there has been no evidence that

*Sachs* failed at Standard Tube or that he acted wrongfully in locating a takeout lender for Manufacturers. There was testimony that Standard Tube failed, but there was also the explanation that this was the result of labor disputes and economic conditions. There has been no showing that these matters were Sachs' to control.

Allegation (11): The Bank decided to keep AUSCO afloat until its debt was retired "in order to avoid another lien's (the PBGC's) attachment." This contention is totally devoid of factual support. But even were this more than sheer speculation, the court cannot see how extending the Debtors' credit at the Debtors' request can possibly rise to the level of inequitable conduct.

Looking at the record as a whole the court keeps in mind these words from *Grant II*, 699 F.2d at 610:

> The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims.

This is the general rule, from which courts deviate only where there has been fraud, overreaching, or spoliation by a creditor. *Grant I*, 4 B.R. at 75. This is the extremely low platform upon which the morality of the marketplace stands. It is to be expected that there will be some rough and tumble between the parties, especially in a default setting where relations tend to fray anyway. This is why the court in *Stratton* required proofs that shock the conscience in order for an equitable subordination claim to survive summary judgment.

The court concludes upon the facts before it that the Trustee has failed to raise a genuine issue of material fact that the Bank committed any fraud, overreaching, or spoliation against AUSCO. There were only two significant occurrences in this case: the requirement of outside manage-

ment, and the negotiation of Sachs' bonus. The new management requirement is a long-recognized remedy of the defaulted senior lender. Neither can the bonus raise an issue of fact. All but a wisp of evidence established that the Bank did not compel AUSCO to pay Sachs any amount.

## F. Conclusion.

The Trustee's case is an inverted pyramid of evidentiary matters. The narrow point at the bottom of the pyramid on which it balances is the handful of statements and actions which can be directly attributed to the Bank. In the middle are the perceptions and assumptions formed by the officers and directors of AUSCO. At the top of the pyramid are broad factual conclusions drawn by the Trustee from the perceptions of AUSCO's management. Viewed from above the pyramid presents an image of massive wrongdoing. But the fundamental weakness of this approach is that the Bank's liability, if it is to have any, must be premised upon *its acts*, not the interpretation of those acts by the Debtor, and not the Trustee's conclusions drawn from those interpretations. This top-heavy construct ultimately topples when exposed to even the lightest breeze of scrutiny.

The Supreme Court in *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, instructs that more than the theoretical possibility of prevailing must be demonstrated by the Trustee in order to survive summary judgment:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

After reviewing the briefs, the transcripts, and the numerous exhibits the court is convinced that a fair-minded jury could only find that Manufacturers acted in good faith, even though it was fully secured, by electing to continue financing AUSCO post-default and even increasing its lending to

AUSCO. The court will not pretend that this evidenced the magnanimous nature of the Bank; it probably acted with knowledge that courts have in the past held oversecured lenders liable for calling their loans prematurely and thereby jeopardizing junior creditors. The court suspects that the Bank earnestly attempted to avoid this hazard by working with AUSCO long after its right to repayment had matured. Unfortunately, the oversecured lender must itself perform a balancing act in such a situation; forbidden by case law on one hand from exercising its contractual rights to foreclose upon its collateral, it may on the other hand be exposed to liability when it takes lesser steps to protect itself during the forbearance period. As untenable as this situation is, the court has seen no evidence to indicate that in this case the Bank lost its balance, despite the maelstrom that swept around it during AUSCO's final tumult toward bankruptcy. Viewing the requirement of replacement management, the incentification memo, the $500,000.00 bonus, the principal reduction payments, the communications between Bank and Sachs, the payment on the letter of credit, and the other arguments the Trustee actually supported with facts, the court sees nothing more than a creditor trying its level best to get out of a bad loan cleanly without either sacrificing its collateral or exposing itself to liability. What is left is "a tale ... full of sound and fury, signifying nothing." MACBETH, *supra* act 5, sc. 5 at 1337. Manufacturers motion for partial summary judgment is therefore granted.

## II. COMBINED REPORT AND RECOMMENDATION AND OPINION AND ORDER DENYING IN PART AND GRANTING IN PART BENJAMIN G. SACHS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

### A. Introduction.

We now turn to Sachs' motion seeking summary judgment on the following counts of the Trustee's Third Amended Complaint:

Count IX Fraudulent Transfer and Fraudulent Conveyance

Count XI Fraud

Count XII Breach of Fiduciary Duty

Count XIII Breach of Contract

Count XIV Equitable Subordination

The court denies Sachs' motion as to all counts except as to that portion of Count IX: Fraudulent Transfer and Fraudulent Conveyance which rests upon actual fraud, and Count XI: Fraud.

This court has already recapitulated much of the factual history of this case in the published portion of this opinion addressing the motion for partial summary judgment filed by the Bank ("the Bank opinion"). We therefore will not separately review the facts, but instead will cite to the record provided where such citation is necessary to rendering an opinion in this matter. The parties should be advised, however, that although we do not repeat here the work already done, the court is aware that the current motion is of no less significance than the prior matters. The statements in the Bank opinion regarding the scope of the court's review and the standards to be applied in granting or denying summary judgment hold equally true in the controversy now before us.

### B. Jurisdiction.

Jurisdiction exists under 28 U.S.C. § 1334(b) as to that part of Sachs' motion pertaining to equitable subordination, it being a core matter under 28 U.S.C. §§ 157(b)(2)(K) and (O). *See* cases cited *supra* at 461. The count alleging fraudulent transfer and fraudulent conveyance is also a core matter. 28 U.S.C. § 157(b)(2)(H). Accordingly this court is empowered to issue a final judgment subject only to the appeal right of 28 U.S.C. § 158 as to the equitable subordination and fraudulent transfer and fraudulent conveyance claims.

The remaining matters addressed in Sachs' motion, fraud, breach of contract and breach of fiduciary duty, have previously been determined to be non-core matters. *See* R & R II at 509. Pursuant to 28 U.S.C. § 157(c)(1) this court may not make final findings of fact and conclusions of law as to these matters absent consent of

all parties. *See* 28 U.S.C. § 157(c)(2). The Trustee having refused to so consent, the court's opinion takes the form of a report and recommendation to the district court as to these non-core matters.

### C. Breach of contract and breach of fiduciary duty (non-core).

We start with the breach of contract and breach of fiduciary counts because the allegations contained in these two counts cut across all of the counts of this complaint currently at issue except the fraud claim. Sachs cites no law for the proposition that he is entitled to summary judgment on this issue, but instead merely incorporates the evidence cited throughout his brief which was offered to support various claims that he performed well at AUSCO. Sachs further alleges that he was not contractually obligated to turn AUSCO around. In response the Trustee offered an affidavit signed by Stuebe which criticizes several aspects of Sachs' management during his tenure at AUSCO. Sachs rebuts this by citing impeaching testimony from Stuebe's deposition in which Stuebe evidenced little or no recollection of the condition of AUSCO at the time Sachs took the helm.

The question thus put to the court is by its very nature factual. Sachs urges this court to determine that Stuebe's affidavit is not competent based upon impeachment testimony in a deposition. The fact remains that Stuebe made the statements contained in his affidavit. As Sachs' successor, he certainly had knowledge of AUSCO's financial condition at some point in time. Furthermore, there came a point in time prior to Sachs' termination when Lester Tiscornia testified that he was critical of Sachs' performance, causing him to express concerns to Day. Day related that he also had concerns with Sachs' performance. *See* facts set forth *supra* at 473.

The court also cannot disregard the criticisms of Sachs' management found in the A.D. Little, Inc. Report, App. II, No. 44 at

3–4. In that report A.D. Little identified three "key elements" of a business turnaround and then observed that none of these elements had been achieved.[28] Given this evidence the court cannot say that there is no genuine issue of material fact as to whether Sachs breached his contract with AUSCO.

A similar problem also arises in connection with the claim for breach of fiduciary duty. Our foremost concern, and that which prevents granting the motion as to this count, arises out of the bonus terms Sachs negotiated for himself. Sachs was AUSCO's fiduciary. In his June 24, 1991 order regarding this court's report and recommendation of April 2, 1991, Judge Bell specifically stated that "Sachs was obligated as a fiduciary to AUSCO, as an officer of the company, under Michigan law." June 24, 1991 order at 2. The issue of whether Sachs was a fiduciary is therefore law of the case.

In connection with a different count of the Trustee's complaint Sachs attempted to distinguish the holding in *Ossen v. Bernatovich (In re Nat'l Safe Northeast, Inc.)*, 76 B.R. 896, 902 (Bankr.D.Conn.1987) that a fiduciary defending a fraudulent conveyance claim "bears the burden of proving good faith on his part" on the basis that he did not control AUSCO. Sachs Brief at 9. This attempt fails because it ignores the case upon which that holding is based. The *Ossen* opinion relied upon *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), directly quoting this language:

A director is a fiduciary. So is a dominant or controlling stockholder.... Their dealings with the [debtor] corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint

the Trustee's supplemental brief. The court declines to rely upon these passages, however, because we are not aware that any transcript of that deposition was ever filed with the court.

---

**28.** The court notes that a number of passages from Ray Fountain's deposition were quoted in

of the corporation and those interested therein.

*Id.* at 902 (as cited in *Ossen,* 76 B.R. at 902; citations omitted). The *Pepper* Court thus premised the liability of directors and stockholders not upon their control of the company but upon their status as fiduciaries. Mr. Sachs was likewise a fiduciary of AUSCO. In order for that term to have any meaning, it must not matter whether he controlled AUSCO or not; as AUSCO's fiduciary, it is his burden to prove the "inherent fairness" of his dealings with AUSCO.

This holding applies with equal force in the context of the negotiation of the bonus. Sachs was a fiduciary when he requested a $500,000.00 bonus. While Sachs asserts that the parties knew he was not acting in his fiduciary capacity when he negotiated the bonus, this position is not supported by either evidence or law. To the contrary, *Pepper* subjects "*any* contract or engagement" with the debtor to a higher level of scrutiny. *Id.* (emphasis supplied). In the absence of any authority presented by Sachs to the contrary, we must hold that this standard applied to the negotiation of the bonus as well. If Sachs had reason to believe that this bonus would significantly impair AUSCO's turnaround efforts, then he may very well have placed his own interests ahead of those of the company. Questions of credibility aside, the characterization of the bonus as coming "out of the hides of the creditors," E. Tiscornia dep. Vol. IV at 629, at least calls into question whether the interests of AUSCO were paramount to Sachs.

More troubling is the structure of the bonus agreement. The tying of Sachs' bonus to the reduction of the Bank's loan may have been an acceptable arrangement from the point of view of a non-fiduciary such as the Bank with no obligation to put AUSCO's interests before its own. However, the propriety of this agreement from Sachs' perspective is another matter. The extent of forbearance which was required for AUSCO's survival could not have been known at the time the bonus was negotiated. However, the bonus could not be paid unless the Bank obligation was significant-ly reduced within a limited time frame. This created the potential for a conflict of interest because there may have been a point in time at which forbearance by the Bank was in AUSCO's best interests while liquidation of the Bank's collateral and reduction of its debt may have been in Sachs' best interests. Whether this became an actual conflict of interest or whether as a result of this conflict Sachs took actions which were in breach of his fiduciary duty is not clear. Given the extensive opportunity the parties have had for discovery, we are skeptical of the limited proofs presented by the Trustee in defense of this motion. However, also given the heightened burden which a fiduciary must carry and our previous determination that there is an issue of fact as to whether Sachs breached his contract, the question of whether, assuming such a contractual breach took place, it was a result of this potential conflict of interest must await the finder of fact.

### D. Fraudulent transfer and fraudulent conveyance (core).

The Trustee seeks to set aside the compensation payments to Sachs as fraudulent transfers under both bankruptcy (11 U.S.C. § 548) and state Mich.Comp.Laws Ann. §§ 566.14, 566.15, 566.16, 566.17, and 566.221) law. Of these provisions, all but 11 U.S.C. § 548(a)(1) and Mich.Comp.Laws Ann. §§ 566.17 and 566.221 require a showing only of constructive fraud. These remaining two require a showing of actual fraud and will be addressed separately.

#### 1. Constructive fraud.

As an initial matter the court addresses the appropriate burden of proof applicable in connection with the constructive fraud claims. Even though this matter is before us on summary judgment any heightened burden of proof applicable to either party must be sustained in order for that party to prevail. *Street,* 886 F.2d at 1479. Sachs argues that the burden of proof as to the fraudulent transfers and conveyances is upon the Trustee, and that the level of the burden is "clear and convincing," citing *U.S. v. Rode,* 749 F.Supp. 1483, 1493 (W.D.Mich.1990). He further contends that

he should not be subjected to a higher level of scrutiny by virtue of his capacity as an officer of AUSCO because he did not control the company. The court rejects this argument for the reasons set forth in the court's discussion of *Ossen, supra* at 496. We further note that under *Ossen* the fiduciary has the burden on issues of good faith and fair dealing; but under *Pepper* that burden extends also to all other aspects of the transaction.

The heart of Sachs' motion with respect to the fraudulent conveyance aspects of the Trustee's complaint is that he gave "fair consideration" for the compensation he received from AUSCO. The parties appear to agree that the starting point for determining whether the consideration given by Sachs was "fair" starts with § 3 of the Uniform Fraudulent Conveyance Act ("UFCA") which defines fair consideration. That section is codified in MICH.COMP.LAWS ANN. § 566.13 which provides that fair consideration is received:

> (a) When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

This definition applies to the claims based upon MICH.COMP.LAWS ANN. §§ 566.14, 566.-15, and 566.16.

A similar standard applies as to the claim under 11 U.S.C. § 548. Judge Graves in *Webster v. Barbara (In re Otis & Edwards, P.C.)*, 115 B.R. 900, 908 (Bankr. E.D.Mich.1990) succinctly identified both the applicable measure of consideration and its source:

> The trustee recovering a fraudulent conveyance under § 548 of the Bankruptcy Code is required to prove that the debtor received "less than reasonably equivalent value." 11 U.S.C. § 548(a)(2)(A). Is proving "less than reasonably equivalent value" under § 548 (or for that matter

under § 4 of the Uniform Fraudulent Transfer Act ("UFTA")) the same as proving lack of "fair consideration" under § 3 of the UFCA? Section 548 of the Bankruptcy Code is modeled on the UFCA, and therefore this court believes that in substance the two terms have the same meaning. The key to understanding the concept of fair consideration is found not in the form of the terms but rather the transactional context in which the issue arises. To this court "fair consideration" equals "reasonably equivalent value." What constitutes fair consideration (or reasonably equivalent value), will change from setting to setting. (Footnotes omitted). We concur with Judge Graves as to this point.

We also agree with his list of fair consideration elements set forth *id.* at 910:

> (1) whether the transaction was conducted at arms-length;
>
> (2) what property or rights were transferred to the debtor;
>
> (3) whether the debtor received additional valuable benefits as a result of the transaction; and
>
> (4) whether the debtor has been rendered "execution proof."

We address these points *seriatim.*

The issue of whether this transaction was at arms' length has already been resolved in connection with the Bank opinion *supra* at 490. AUSCO had the power to hire others besides Sachs at all relevant times.

The second and third elements focus on the nature of the transfer to the debtor in exchange for the challenged conveyance. The Trustee contends that Sachs' efforts were qualitatively deficient in a number of ways.

We believe the distinction between the quality and the quantity of the services rendered is critical. Where in such a relationship the compensation is commensurate with the undertaking and the employee attempts in good faith to fulfill that undertaking, fair consideration has been given. While not directly on point, *Merrill v. Allen (In re Universal*

*Clearing House Co.)*, 60 B.R. 985 (D.C.Utah 1986) is nevertheless instructive. In that case the trustee sought to set aside commissions paid to salespersons employed by a debtor engaged in a Ponzi scheme to defraud investors in which incoming investments would be used to pay returns to existing investors. With each investment sold, the asset deficiency created or "hole" by the Ponzi scheme became wider. Thus, the trustee argued, the debtor received no value for the commission paid on each sale because its liability for the deficiency increased. The bankruptcy court agreed with this conclusion, but was reversed by the district court:

> The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided serves to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants, and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances. We see no material distinction between such persons or entities and appellants. All were necessary to the success of the debtors' scheme.

> *The financial position of a debtor need not necessarily be improved by a particular transaction in order for us to hold that value was given. For example, if an employee or officer of a legitimate company made a bad business decision which actually worsened the financial position of that company, we do not believe that the salary paid to that officer or employee could be set aside as a fraudulent conveyance. Similarly, the compensation of an attorney who is retained on an hourly*

> *basis is not contingent on him winning a case or otherwise improving his client's position.*

*Id.* at 999 (footnotes omitted; emphasis supplied). To the extent that the Trustee alleges that Sachs made bad business decisions, the court agrees with *Merrill* that bad business decisions without more cannot form the basis for a fraudulent conveyance action. To hold otherwise would turn every breach of contract action involving an insolvent plaintiff into a fraudulent conveyance claim.

The foregoing was predicated on the salary for the employment being otherwise reasonable measured against the scope of the undertaking. *See id.* at 988. We also believe that Sachs has met his burden on this issue. Sachs relied upon the oft-cited letter to the PBGC by Rose touting Sachs' qualifications (Sachs' Appendix No. 4) to establish that he was qualified. He also offered proofs to show that he had a herculean task before him and that he expended a great deal of time and effort in an attempt to accomplish this task. *See* R. Fletcher dep., Vol. II at 15. Finally, he offered the example of Stuebe's compensation and Sachs' previous salary at Standard Tube which was comparable. The Trustee offered no proofs in direct contradiction except that the contract called for fewer than full time work and involved a large sum of money. Given the uncontested testimony offered by Sachs, we find this indicative of nothing. Had Sachs successfully engineered the turnaround of AUSCO in two weeks we suspect that he would be worth every penny he was paid. The Trustee's challenge goes to the quality of the service, not the propriety of the salary which AUSCO agreed to pay for those services. These are breach of contract issues.

The Trustee not responding to the contention that payments to Sachs did not render AUSCO insolvent, Sachs has carried his burden on the fourth element as well. We therefore conclude that Sachs gave fair consideration.

■ However, there is a fact issue as to whether Sachs transferred his consider-

ation in good faith, which is also required. The court has previously determined that a fact issue remains regarding the possibility that Sachs breached his fiduciary duty. If the Trustee is successful on this count, it is conceivable that the finder of fact could also determine that Sachs acted in good faith. For this reason we are constrained to deny Sachs' motion to this limited extent.

### 2. Actual Fraud.

 As previously stated, the fraudulent conveyance claims arising under 11 U.S.C. § 548(a)(1) and under MICH.COMP. LAWS ANN. §§ 566.17 and 566.221 rest upon actual fraud. Each, however, is based not upon a fraudulent intent by the transferee, but rests instead upon the fraudulent intent of the transferor:

The trustee may avoid and transfer ... if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted....

11 U.S.C. § 548(a).

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

MICH.COMP.LAWS ANN. § 566.17.

Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or of any rents or profits issuing therefrom, and any charge upon lands, goods or things in action, or upon the rents or profits thereof, made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands and every bond or other evidence of debt given, suit commenced, decree or judgment suffered, with the like intent,

as against the person so hindered, delayed, or defrauded, shall be void.

MICH.COMP.LAWS ANN. § 566.221. Because the focus of these sections is not upon the acts of the transferee but upon the transferor, we believe that this dictates a different burden of proof, and that the clear and convincing burden upon the Trustee as discussed in *Rode*, 749 F.Supp. at 1493 is now applicable. Therefore, Sachs need merely point out that the Trustee has had sufficient time for discovery and has been unable to unearth any evidence of such an intent on AUSCO's part in order to carry his initial burden in seeking summary judgment. *Street*, 886 F.2d at 1479. He has done this. In addition, he has offered several letters between AUSCO and its counsel to support his contention that AUSCO had no such intent. The Trustee has objected to his use of these letters asserting privilege.

We need not decide the privilege issue because the Trustee has not carried his burden of coming forth with affirmative evidence that AUSCO intended to defraud its creditors when it paid Sachs. The only evidence offered was Sachs' statement that his bonus would come out of the hides of creditors, purportedly made to Edward. However, this statement is not at all probative of what the Tiscornias and Gerber thought at the time that they agreed to pay Sachs' salary. Given all the other proofs in this case and the angry allegation by the debtor-in-possession (to which the Trustee succeeds) that Sachs is responsible because he failed to accomplish a turnaround, the court can only conclude that Sachs was paid in the very hope that his efforts would *enable* AUSCO to pay its creditors. The Trustee's claim must fail on the actual fraud claims brought under 11 U.S.C. § 548(a)(1) and MICH.COMP.LAWS ANN. §§ 566.17 and 566.221.

### E. Equitable subordination (core).

 Our analysis as to this count must start with this statement contained in the April 2, 1991 Report and Recommendation at 30 in which we declined to dismiss this count for failure to state a claim:

We retain Count XVII noting that equitable subordination is not a cause of action *per se* but rather a remedy to be imposed after the Trustee has proved his case as to the remaining counts.

This statement remains true today. One of the premises upon which a court may base the equitable subordination of a claim is the breach of a fiduciary duty. *See Mobile Steel,* 563 F.2d at 701. The distinction between the equitable subordination of a fiduciary's claim as opposed to a non-fiduciary's, discussed at length in the Bank opinion, is critical. In this context, equitable subordination is merely a remedy which the court may deem appropriate if relief is granted as to one of the Trustee's other causes of action.

**F. Fraud (non-core).** ▉

Lastly, we turn to the fraud count. As we stated in the April 2, 1991 Report and Recommendation at 2:

> Under Michigan law if at the time a representation is made there was no present intent to carry it out, the representation constitutes fraud, *Gorman v. Soble,* 120 Mich.App. 831 [328 N.W.2d 119] (1983) [ (1982) ]. Of course the complainant must also show reasonable reliance. We recognize that while it may be extremely difficult to prove that Sachs did not intend to sufficiently perform at the time he promised to do so the question before us is not whether Plaintiff will prevail but rather the sufficiency of the pleading.

To this we now add that in any such action the burden of proof is upon the plaintiff and that the proofs offered by the plaintiff must be clear and convincing. *Gorman,* 120 Mich.App. at 840, 328 N.W.2d 119. Thus it was with some incredulity that we read the point heading as to this issue in the Trustee's responsive brief: "Sachs Makes No Showing That Ausco's Fraud Claim Is Not Grounded In Fact." Trustee's Brief in Response to Sachs' Motion at 14. Sachs need make no such showing. As previously stated, he may meet his burden simply by pointing out that the Trustee

has had sufficient time for discovery and has produced no evidence to support this element of his case.

Sachs has succeeded in doing exactly this. The Trustee has offered no proof to show that Sachs did not intend to perform his contractual duties. The best proofs that have been offered are the statement attributed to Embree that the Bank wanted its debt retired and that after that was accomplished Sachs was free to get what he could for himself, J. Tiscornia dep., Vol. XX at 2507–08; and that Sachs related to Edward Tiscornia that his bonus was going to come out of the hides of AUSCO's creditors. It can readily be seen that neither of these statements are probative of a present intent by Sachs not to carry out his contractual obligations. Embree's statement can only be indicative of the state of mind of the Bank; it certainly is not probative of what Sachs thought.

The statement regarding creditors' hides likewise cannot establish fraud because it was made to Edward Tiscornia in connection with the negotiation of the contract. E. Tiscornia dep., Vol. IV at 626–29. As the only proof (other than the discredited Embree statement) of Sachs' intentions at the time the contract was made, this places the trustee on the horns of a dilemma. If the statement was not evidence of a fraudulent intent, the Trustee has failed to carry his burden and the claim must fail. But if it is evidence of a fraudulent intent, AUSCO entered into the contract at issue with full knowledge of that intent because the statement was made to an AUSCO director in the course of negotiation of the same contract. In this case any reliance by AUSCO cannot be reasonable. In either event, the claim must fail.

**G. Conclusion.**

In the introduction of his brief Sachs urges the court to keep in mind that this litigation originated with Sachs' complaint against AUSCO and that the counterclaim which is the subject of this motion therefore rests in a defensive posture. Sachs' Brief at 2. The court is acutely aware of

the origins of this suit and all the subsequent broadsides which it has engendered. This litigation has indeed run away from the parties, but at the epicenter is a factual dispute between AUSCO and Sachs regarding Sachs' performance of his contractual duties. All of the claims which remain against Sachs radiate from this core; the elimination of a portion of the fraudulent conveyance/fraudulent transfer claims, the fraud claim and the claims against the Bank returns this case to the real issues that caused it to be brought in the first place. For the foregoing reasons,

## III. ORDER AND RECOMMENDATION.

IT IS ORDERED that Manufacturers National Bank of Detroit's motion for partial summary judgment is granted in its entirety;

IT IS FURTHER ORDERED that Sachs' motion for partial summary judgment is granted as to the fraudulent conveyance claims to the extent that they assert that Sachs did not give reasonably equivalent or fair consideration value under 11 U.S.C. § 548(a)(2)(A) or MICH.COMP.LAWS ANN. §§ 566.14, 566.15, or 566.16;

IT IS FURTHER ORDERED that Sachs' motion for partial summary judgment is granted in its entirety as to claims under 11 U.S.C. § 548(a)(1) and MICH.COMP.LAWS ANN. §§ 566.17 and 566.221;

IT IS FURTHER ORDERED that Sachs' motion for partial summary judgment is denied as to the remaining core matters; and

IT IS RECOMMENDED pursuant to 28 U.S.C. § 157(c)(1) that Sachs' motion for partial summary judgment as to the non-core matters be granted as to the fraud count and denied as to the breach of contract and breach of fiduciary duty counts.

## IV. WITNESS INDEX.

*Numbers refer to page references.*

**A.D. Little, Inc.** Consultant firm hired by PBGC. 473.

**Buchanan, Donald.** Member of the Loan Policy Committee. Buchanan suggested that AUSCO bring in outside management help but did not suggest any names. 467.

**Bunker, Jay.** Succeeded Mewhort as AUSCO director from the Bank. Resigned from board in October 1986, two months after AUSCO's default. 464, 467, 479–80.

**Day, David.** Bank V.P. Responsible for AUSCO account at all relevant times except from January 1987 to April 1987. 465, 465–66, 466–67, 468, 470, 473, 475, 476, 485, 492–93.

**Embree, Jim.** Commercial loan officer who handled AUSCO account from January 1987 to April 1987. 466–67, 470, 471, 471, 471–72, 472, 484, 484, 490, 490–91, 501, 501.

**Fletcher, Robert.** Industrial engineer with experience in turnaround situations. Hired as a consultant by AUSCO in March 1987, full time employee in August 1987. Became Executive V.P. in March 1988. Ultimately became President of Operations after the business was sold to the Brenlin Group in January, 1990. 473, 499.

**Fountain, Ray.** Alternate to Ben Sachs suggested by David Day to AUSCO. 466, 466, 466–67, 472, 483, 483–84, 484, 496.

**Gerber, Loren.** Hired by AUSCO in 1969 as assistant controller. Promoted to controller and chief financial officer in 1976. Also became a director in 1976. References throughout.

**Hofmeister, George.** Candidate for AUSCO board sponsored by PBGC. 476.

**Klein, Robert.** Representative of PBGC who met with Rose and Lester Tiscornia re replacement of Sachs. 473, 473, 476.

**Porter, Hugh.** Junior loan officer on AUSCO account until April 1987. 465, 468, 472.

**Rose, Ron.** Attorney at Dykema Gossett who represented AUSCO from late 1985 through June 1988. References throughout.

**Sachs, Benjamin.** CEO hired by AUSCO at Bank's suggestion. References throughout.

**Snellgrove, George.** Potential replacement for Sachs interviewed by the Tiscornias when Sachs second contract was being

negotiated. Snellgrove ultimately was not hired. 472.

**Stuebe, David.** Replacement for Sachs hired by AUSCO. 476, 477, 484, 496, 499.

**Tiscornia, Ed.** One of Lester's two sons and an AUSCO director. References throughout.

**Tiscornia, Jim.** One of Lester's two sons, an AUSCO director, and AUSCO president replaced by Sachs. References throughout.

**Tiscornia, Lester.** Controlling shareholder of AUSCO and father of Jim and Ed Tiscornia. Lester was also on the board of directors and became chairman of the board at the same time that Ben Sachs became CEO. References throughout.

**Troff, Ted.** Tiscornias' attorney in contract negotiations with Sachs regarding second employment contract. 472.

**Winiarski, Thadeaus.** Member of the Bank's Loan Policy Committee. 467.